1    Jason D. Guinasso (SBN# 8478)
     HUTCHISON & STEFFEN, PLLC
2    500 Damonte Ranch Parkway, Suite 980
     Reno, NV 89521
3    775.853.8746
     *jguinasso@hutchlegal.com*
4
     Benjamin W. Bull*
5    Peter A. Gentala*
     Dani Bianculli Pinter*
6    Christen M. Price*
     Pansy Watson*
7    NATIONAL CENTER ON SEXUAL
     EXPLOITATION
8    1201 F Street, NW, Suite 200
     Washington, DC 20004
9    202.393.7245
     *lawcenter@ncose.com*
10
     *Pro Hac Vice Admissions Pending*
11   *Attorneys for Plaintiffs*

12                   **UNITED STATES DISTRICT COURT**

13                      **DISTRICT OF NEVADA**

14   ANGELA WILLIAMS; JANE DOE;

15   Plaintiffs,

16   v.

17   STEVE SISOLAK, Governor of Nevada, in          Case No:
     his official capacity; AARON FORD,
18   Attorney General of Nevada, in his official
     capacity; THE CITY OF LAS VEGAS;
19   CLARK COUNTY; NYE COUNTY;                       **COMPLAINT FOR**
     CHICKEN RANCH; JAMAL RASHID;                    **DECLARATORY AND**
20   MALLY MALL MUSIC, LLC, FUTURE                   **INJUNCTIVE RELIEF**
     MUSIC, LLC, PF SOCIAL MEDIA
21   MANAGEMENT, LLC, E.P. SANCTUARY                 **JURY TRIAL DEMANDED**
     BLU MAGIC MUSIC, LLC, EXCLUSIVE
22   BEAUTY LOUNGE, LLC, FIRST

23

24

1    INVESTMENT PROPERTY LLC, V.I.P.
2    ENTERTAINMENT, LLC, MP3
     PRODUCTIONS, INC., & MMM
3    PRODUCTIONS, INC.

4    Defendants.

5    **<ins>COMPLAINT</ins>**

6    **INTRODUCTION**

7        1.    It is axiomatic that the right to be free from slavery is among the most basic of

8    human rights: uncontested in international law, and enshrined in the United States Constitution

9    at significant cost.

10       2.    Yet it is a right numerous women and girls are denied in Nevada, where they

11   are bought and sold in a glamorized, lucrative monument to male sexual entitlement: the state's

12   prostitution industrial complex.

13       3.    Nevada has cooperated with the City of Las Vegas, Clark County, Nye County,

14   the Chicken Ranch, Jamal Rashid; Mally Mall Music, LLC, Future Music, LLC, PF Social

15   Media Management, LLC, E.P. Sanctuary, Blu Magic Music, LLC, Exclusive Beauty Lounge,

16   LLC, First Investment Property LLC, V.I.P. Entertainment, LLC; MP3 Productions, Inc., and

17   MMM Productions, Inc. to maintain and profit from a legalized system of prostitution –

18   explicit in certain counties, and de facto elsewhere.

19       4.    Plaintiffs Angela Williams and Jane Doe were sex trafficked due to that system

20   of legalized prostitution, that is, they were induced to engage in commercial sex acts through

21   force, fraud, and coercion – including psychological manipulation and debt bondage – in legal

22   strip clubs, legal escort businesses, and a legal brothel operating in Nevada.

23       5.    The collusion of the State of Nevada, its political subdivisions, and private

24

businesses in the sex trade, which have in turn failed to enforce or violated state and federal laws against prostitution, prostitution advertising, debt bondage, and sex trafficking, has allowed sex traffickers to operate in Nevada with impunity.

6.      As victims of sex trafficking, Plaintiffs were diminished to a status in which their sex traffickers and buyers exercised powers of ownership over them—that is, a condition of slavery.

7.      Under the Thirteenth Amendment, states cannot create conditions that allow slavery or involuntary servitude to flourish, including in the form of sex trafficking.  By providing legal cover for the sex trade, that is precisely what Nevada has done.

8.      Additionally, neither states nor private parties may perpetrate or benefit from slavery under the Trafficking Victims Protection Act, yet the Defendants have done so – through direct revenues, taxes, and licensing fees.

9.      Because Defendants have facilitated and profited from sex trafficking, violating the Thirteenth Amendment's ban on slavery and involuntary servitude, and the Trafficking Victims Protection Act, Plaintiffs now seek to hold them accountable for these human rights violations.

**JURISDICTION AND VENUE**

10.     This civil rights action raises federal questions under the Thirteenth Amendment to the United States Constitution, and the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1591–95.

11.     This Court has original jurisdiction over these federal claims under 28 U.S.C. §§ 1331 and 1343.

12.     This Court has authority to award the requested damages under 28 U.S.C. § 1343; the requested declaratory relief under 28 U.S.C. §§ 2201–02; the requested injunctive relief under 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and costs and attorneys' fees under 42 U.S.C. § 1988.

13.     This Court has supplemental jurisdiction over the state law claims made herein pursuant to 28 U.S.C. § 1367.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because Defendants reside in this district and division and/or all of the acts described in this Complaint occurred in this district.

**PARTIES**

15.     Plaintiff Angela Williams is an individual residing in Texas.

16.     Plaintiff Jane Doe is an individual residing in California.

17.     Due to the sensitive, private, nature of Plaintiff's allegations, and the potential for harmful retaliation against her, Plaintiff requests that this Court permit her to proceed under a pseudonym.  Courts recognize an exception to the general rule that pleadings name all parties when the issues involved are of a sensitive and highly personal nature.

18.     For good cause, as exists here, the Court may permit Plaintiff to proceed in pseudonym to protect a party from annoyance, embarrassment, oppression, or undue burden or expense.  Here, granting pseudonym status is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape.  Plaintiff fears the stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

19.     Defendants will not be prejudiced by Plaintiff's use of a pseudonym.  Plaintiff

will agree to reveal their identity to the Defendants for the limited purpose of investigating Plaintiff's claims once the parties are governed by a protective order.  Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her personal life or future employment prospects.

20.     Plaintiff's motion for a protective order and leave to proceed pseudonymously is forthcoming.

21.     Defendant Steve Sisolak is the Governor of Nevada, ultimately responsible for enforcing Nevada's laws and regulations, and is sued in his official capacity.

22.     Defendant Aaron Ford is the Attorney General of Nevada, who is authorized to enforce and prosecute violations of Nevada's laws and regulations, and is sued in his official capacity.

23.     Defendants Sisolak and Ford will be referred to here as "State Defendants."

24.     Defendant City of Las Vegas is a municipal corporation authorized under Nevada law with the power to sue and be sued, to issue licenses and otherwise regulate escort agencies and related businesses, and to enact and enforce certain ordinances challenged in this lawsuit.

25.     Defendant Clark County is a municipal corporation authorized under Nevada law with the power to sue and be sued, to issue licenses and otherwise regulate escort agencies and related businesses, and to enact and enforce certain ordinances challenged in this lawsuit.

26.     Defendant Nye County is a municipal corporation authorized under Nevada law with the power to sue and be sued, to issue licenses and otherwise regulate brothels within the county, and to enact and enforce certain ordinances challenged in this lawsuit.

27.     Defendants City of Las Vegas, Clark County, and Nye County will be referred to here as "City Defendants."

28.     Defendant Jamal Rashid, also known as "Mally Mall," is an individual currently residing at Federal Correctional Institution Sheridan, 27072 Ballston Road, Sheridan, OR 97378.

29.     Defendant Mally Mall Music, LLC is a company located at 2764 N Green Valley Pkwy #400, Henderson, NV, 89014, whose registered agent is Jennifer Paone. The managing member is Jamal Rashid, addressed at 2764 N Green Valley Pkwy #400, Henderson, NV, 89014.

30.     Defendant Future Music, LLC is a company located at 2764 N Green Valley Pkwy #400, Henderson, NV, 89014, whose registered agent is Jennifer Paone. The managing member is Jamal Rashid, located at 2764 N Green Valley Pkwy #400, Henderson, NV, 89014.

31.     Defendant PF Social Media Management, LLC is a company located at 2764 N Green Valley Pkwy #400, Henderson, NV, 89014, whose registered agent is Jamal Rashid.

32.     Defendant Blu Magic Music, LLC is a company located at 2764 N Green Valley Pkwy #400, Henderson, NV, 89014, whose registered agent is Jennifer Paone. The managing member is Jamal Rashid, located at 2764 N Green Valley Pkwy #400, Henderson, NV, 89014.

33.     Defendant Exclusive Beauty Lounge, LLC is a company located at 2764 N Green Valley Pkwy #400, Henderson, NV, 89014, whose managing members are Jamal Rashid and Tarnita Woodard.

34.     Defendant First Investment Property LLC is a company located at 2764 N Green Valley Pkwy #400, Henderson, NV, 89014, whose registered agent is Jennifer Paone. The managing member is Jamal Rashid, located at 2764 N Green Valley Pkwy #400, Henderson,

NV, 89014.

35.     Defendant V.I.P. Entertainment, LLC is a company located at 2764 N Green Valley Pkwy #400, Henderson, NV, 89014, whose registered agent is Tarnita Woodard. The managing member is John Williams, addressed at 528 S. Casino Center Blvd #300, Las Vegas, NV, 89101.

36.     Defendant MP3 Productions, Inc. is a company located at 4730 S. Fort Apache Rd., Suite 300, Las Vegas, NV, 89147, whose registered agent is Nevada Corporate Headquarters, Inc. The managing member is Tarnita Woodard, located at 1452 W Horizon Ridge Pkwy #121, Henderson, NV, 89012.

37.     Defendant MMM Productions, Inc. is a company located at 2520 St. Rose Pkwy Ste 319, Henderson, NV, 89074, whose registered agent is United Corporate Headquarters, Inc. The managing member is Jamal Rashid, located at 420 Lexington Ave., Suite 1756, New York, NY, 10170.

38.     Defendant E.P. Sanctuary is a non-profit located at 2764 N Green Valley Pkwy #400, Henderson, NV, 89014, whose registered agent is Jamal Rashid.

39.     The corporations above are incorporated and/or licensed under Nevada law with the power to sue and be sued. [1]

40.     On information and belief,  while not all of the companies listed are Mr. Rashid's escort ventures, all of the companies received or currently receive revenue and engaged in profit sharing with the escort companies. They also raise concerns of commingling assets and self-dealing.

41.     Defendants Mally Mall Music, LLC, Future Music, LLC, PF Social Media

---

[1] A revoked or dissolved company can still be sued. *See* NEV. REV. STAT. §§ 86-274(5), & 86-505.

1  Management, LLC, E.P. Sanctuary, Blu Magic Music, LLC, Exclusive Beauty Lounge, LLC,

2  First Investment Property LLC, V.I.P. Entertainment, LLC, MP3 Productions, Inc., and MMM

3  Productions, Inc. are legally affiliated with Defendant Jamal Rashid and will be referenced

4  here with Rashid as "Escort Agency Defendants."

5      42.    Defendant Chicken Ranch is a legal brothel located at 10511 Homestead Rd,

6  Pahrump, NV 89061. Defendant Chicken Ranch will be referenced here with the Escort

7  Agency Defendants as "Sex Industry Defendants."

8  **BACKGROUND**

9  ***The US sex trade in historical context***

10 *Sex trafficking and chattel slavery*

11     43.    For over three hundred years, African people and their descendants were

12 bought, sold, and used in chattel slavery in the Americas, that is, they were legally considered

13 property, and were subjected to untold abuses, including torture, murder, family separation,

14 coercion, and exploitation of their labor.

15     44.    Sex slavery was a part of chattel slavery in the American South.  White men

16 subjected enslaved women and girls to rape and sexual abuse and harassment as a matter of

17 course,[2] and women and girls were also sold specifically for prostitution in the

18 euphemistically-named "fancy" trade.[3]

19     45.    Ellen Brooks was one such woman, bought by Bruckner Payne, to be a

20 seamstress (a euphemism), who abused her so badly that she died two weeks later.[4]  Enslaved

21

22 _____

[2] Neal Kumar Katyal, *Men Who Own Women: A Thirteenth Amendment Critique of Forced Prostitution*, 103 Yale

23 L.J. 791, 796–803 (1993).
[3] Edward E. Baptist, *"Cuffy," "Fancy Maids," and "One-Eyed Men": Rape, Commodification, and The Domestic Slave Trade in the United States*, 106 Am. Hist. Rev. 1619, 1619–22 (2001).

24 [4] Walter Johnson, *Soul by Soul: Life Inside the Antebellum Slave Market* 115 (Harvard University Press, 1999).

women and girls were also forced to work in or manage brothels, and give their owners the fees they got from sex buyers.[5]

46.    In Louisiana, some sisters were raised as free daughters of a white planter and his mixed-race mistress.  Their father did not establish their legal status, as their mother warned him to do, before he died.  His creditors insisted that the sisters were legally slaves and refused their uncle's attempt to buy their freedom; they were sold into the New Orleans sex slavery market to pay for their father's debts.[6]

47.    In Alexandria, Virginia, Isaac Franklin and John Armfield had the largest, wealthiest slave trading firm in the United States in the 1820s and 1830s.[7]  Franklin was one of the main pimps for the New Orleans sex trafficking market.[8]  Both men joked in their letters to each other about the women they routinely raped.[9]

48.    This pervasive, commercialized sexual violence was not only admitted by the perpetrators, but decried by several abolitionists.  Harriet Jacobs, a formerly enslaved woman, wrote that as a 15-year-old, she was subjected to daily sexual abuse at the hands of her owner.[10]  Frederick Douglass called slave owners legalized brothel keepers, and averred that at least a million enslaved women were "consigned to a life of revolting prostitution" in the South.[11]

---

[5] Judith Schafer, *Brothels, Depravity and Abandoned Women: Illegal Sex in Antebellum New Orleans* 11 LA. STATE UNIV. PRESS (2009).

[6] 2 Harriet Martineau, *Society in America* 115-16, (Julia Miller ed., Project Gutenberg 2016) (1837).

[7] Hannah Natanson, *They were Once America's Cruelest, Richest Slave Traders. Why Does No One Know Their Names?*, WASHINGTON POST (Sept. 14, 2019, 7:00 AM), https://www.washingtonpost.com/history/2019/09/14/they-were-once-americas-cruelest-richest-slave-traders-why-does-no-one-know-their-names/.

[8] Baptist, *supra* note 2, at 1619.

[9] Natanson, *supra* note 6.

[10] Cheryl Nelson Butler, *The Racial Roots of Human Trafficking*, 62 UCLA L. REV. 1464, 1473–75 (2015).

[11] Katyal, *supra* note 1, at 799 (quoting *Frederick Douglass Discusses Slavery, 1850, in A Documentary History of the Negro People in the United States* 309, 313 (Herbert Aptheker ed., 2d ed. 1969)("I hold myself ready to prove that more than a million of women, in the Southern States of this Union, are, by the laws of the land, and through no fault of their own, consigned to a life of revolting prostitution .... I am also prepared to prove that slave breeding is relied upon by Virginia as one of her chief sources of wealth. It has long been known that the best blood of old Virginia may now be found in the slave markets of New Orleans. It is also known that slave women

49.     One proslavery advocate confessed as much, writing:  "The fact is, that, in the Southern States, the prostitutes of the communities are usually slaves, unless they are imported from the free states.  The negro and the colored woman in the south, supply the place, which at the north is usually filled with factory and serving girls."[12]

*The Thirteenth Amendment*

50.     The Thirteenth Amendment was ratified in 1865, following the Civil War, to abolish slavery and involuntary servitude, except as a punishment for a crime.

51.     After the Amendment was ratified, Southern states attempted to evade its implications, including through allowing debt bondage, that is, compelled or voluntary labor to repay a debt.  Congress then passed the Peonage Act in 1867, banning debt bondage.[13]

52.     The United States Supreme Court also clarified the Amendment's application was not limited to the enslavement of black people in the American South, but to all persons, and to any form of slavery or involuntary servitude.[14]

53.     Southern states then started enacting criminal fraud statutes.  For example, a person who entered into a written contract for services in Alabama, received payment, and then failed to do the work or return the money could be charged with criminal fraud.[15]

---

who are nearly white, are sold in those markets, at prices which proclaim, trumpet-tongued, the accursed purposes to which they are to be devoted. Youth and elegance, beauty and innocence, are exposed for sale upon the auction block; while villainous monsters stand around, with pockets lined with gold, gazing with lustful eyes upon their prospective victims[.]").

[12] W. Gilmore Simms, *The Morals of Slavery,* 39-40; *reprinted in* THE PRO-SLAVERY ARGUMENT 175, 2230 (Lippincott, Grambo, & Co. 1853), https://archive.org/details/proslaveryargum00unkngoog/page/n239/mode/2up

[13] 42 U.S.C. § 1994.   *See also 42 U.S. Code § 1994-Peonage Abolished*, CORNELL L. SCH., https://www.law.cornell.edu/uscode/text/42/1994 (last visited July14, 2021).

[14] *See, e.g.*, *The Slaughterhouse Cases*, 83 U.S. (16 Wall.) 36 (1873).

[15] *Bailey v. Alabama*, 219 U.S. 219, 227–28 (1911).  There was an intent requirement:  you had to intend to injure or defraud the employer, but with a significant caveat:  simply failing to provide the services – for whatever reason – was considered evidence of intent to commit fraud.

54.     The Supreme Court held that Alabama's law violated the Thirteenth Amendment, because threatening criminal penalties for failure to perform a contract was a way to indirectly coerce labor through debt bondage.[16]

55.     Alabama tried to argue that the law was merely a neutral fraud statute, but the Court reasoned that using apparently neutral statutes that had the effect – through the independent actions of third parties – of perpetuating slavery violated the Thirteenth Amendment.[17]

*Feminist activism and legal reforms*

56.     Many abolitionists were also active in movements to secure women's rights. Feminist activism in the late 1800s and early 1900s was concerned with preventing men's violence against women, including statutory rape, domestic violence, and prostitution.[18]

57.     In particular, activists focused on stopping what they called "white slavery" – that is, women and girls being forced, coerced, or defrauded into prostitution.

58.     Despite the characterization of sex trafficking as a danger primarily to white women, which was often fueled by racism, women of color remained very vulnerable to commercial sexual exploitation after the Thirteenth Amendment was enacted.

59.     During the Jim Crow era, red light districts were placed in black neighborhoods, and segregation did not stop white men from frequenting them.[19]

---

[16] *Bailey v. Alabama*, 219 U.S. 219, 238-242, 245 (1911).
[17] *Id.*
[18] *See, e.g.*, Bonnie Shucha, *White Slavery in the Northwoods: Early U.S. Anti-Sex Trafficking and its Continuing Relevance to Trafficking Reform*, 23 Wm. & Mary J. Race, Gender, & Soc. Just. 75, 75–76 (2016); Jane E. Larson, *"Even a Worm Will Turn at Last": Rape Reform in Late Nineteenth-Century America*, 9 YALE. J. L. & HUMANS. 1, 2–4 (1997); Katyal, *supra* note 1, at 805–06.
[19] Vednita Nelson, *Prostitution: Where Racism & Sexism Intersect*, 1 MICH. J. GENDER & L. 81, 84 n.14 (1993). *See also* Anna Julia Cooper, *A Voice from the South* 12 (1891) (noting the need for a White Cross league – an anti-prostitution organization which focused its efforts on men – for black women and girls).

60.    A similar story played out in the North, with Southern black women being promised big city factory jobs and then forced into prostitution when they arrived.[20]

61.    Additionally, Chinese women were trafficked into the United States for purposes of prostitution,[21] into situations recognized as slavery by the Ninth Circuit in at least one case.[22]

62.    For many key feminist activists in the nineteenth and early twentieth centuries campaigning against prostitution as a form of men's violence against women was central to their advocacy.

63.    One of these was the prominent physician and theologian Katharine Bushnell, a spokesperson for the Women's Christian Temperance Union, who spent several years opposing the prostitution of Chinese women and girls in the San Francisco area, who were exploited by Chinese traffickers and white male buyers.[23]

64.    Some women and girls were auctioned off for prostitution at San Francisco's wharf, well after slavery had been outlawed in the United States.[24]

65.    Women formed a mission house as a refuge for prostituted women and girls, facing down pressure from white city officials and Chinese organized crime.

66.    Bushnell similarly investigated and exposed the sex trafficking of women and girls into Wisconsin in the 1880s, where many brothels were attached to logging camps.[25]

---

[20] Butler, *supra* note 9, at 1490.
[21] *See, e.g.*, *Id.* at 1480.
[22] The court found that this fact did not enable them to prevent enforcement of immigration laws. *United States v. Ah Sou*, 138 F. 775, 777–78 (9th Cir. 1905) ("The fact that the deportation of a Chinese slave girl illegally brought into this country for purposes of prostitution by her master, from whom she subsequently escaped, would result in remanding her to slavery and degradation, affords no ground upon which the courts can refuse to enforce the statute.").
[23] Dana Hardwick, *San Francisco and 'Social Hygiene,'* in *Oh Thou Woman that Bringest Good Tidings*, 73-75 (2002).
[24] Anna Diamond, *The Women Who Waged War Against Sex Trafficking in San Francisco,* SMITHSONIAN MAGAZINE (May 8, 2019), https://www.smithsonianmag.com/history/women-banded-together-fight-slavery-san-francisco-180972113/.
[25] *See, e.g.*, Bonnie Shucha, *White Slavery in the Northwoods: Early U.S. Anti-Sex Trafficking and Its Continuing Relevance to Trafficking Reform*, 23 Wm. & Mary J. Women & L. 75 (2016).

67.     Bushnell also worked with Josephine Butler, an abolitionist and women's rights activist, to combat the exploitation of women and girls through prostitution in other countries as well, including China, India, and the United Kingdom.

68.     For example, in nineteenth century Britain, Josephine Butler's campaign to eradicate the Contagious Diseases Act centered on the fact that the process was invasive, degrading, and stigmatizing. The testing of alleged prostituted women, and not male buyers, highlighted the disparity between the prostituted and those exploiting them. It not only neglected the harm of prostitution itself but compounded its harm by only protecting the male buyer. It was successfully repealed in 1886.[26]

69.     In 1910, Congress passed the Mann Act, which criminalized the interstate or foreign transport of women and girls for prostitution purposes.[27]  Congressional reports from that time show that Congress considered what they termed "forced prostitution" to be a form of slavery.[28]

70.     Between 1904 and 1949, a number of international treaties also sought to address the sex trafficking of women and girls, assuming a direct connection between prostitution and exploitation.[29]

---

[26] Josephine Butler, *Josephine Butler and the Prostitution Campaigns: Diseases of the Bodily Politic* (Jane Jordan & Ingrid Sharp eds., 2004), https://www.routledgehistoricalresources.com/feminism/sets/josephine-butler-and-the-prostitution-campaigns.

[27] *Mann Act*, CORNELL L. SCH., https://www.law.cornell.edu/wex/mann_act (last visited Apr. 21, 2021).

[28] *See also* Katyal, *supra* note 1, at 806 (citing H.R. Rep. No. 47, 61st Cong., 2d Sess. 10 (1909); S. Rep. No. 886, 61st Cong., 2d Sess. 11 (1909)).

[29] *See* Convention for the Suppression of the Traffic in Persons and of the Exploitation of the Prostitution of Others, July 25, 1951, 96 U.N.T.S. 271, https://www.ohchr.org/en/professionalinterest/pages/trafficinpersons.aspx.
          (1) International Agreement of 18 May 1904 for the Suppression of the White Slave Traffic, as amended by the Protocol approved by the General Assembly of the United Nations on 3 December 1948,
          (2) International Convention of 4 May 1910 for the Suppression of the White Slave Traffic, as amended by the above-mentioned Protocol,
          (3) International Convention of 30 September 1921 for the Suppression of the Traffic in Women and Children, as amended by the Protocol approved by the General Assembly of the United Nations on 20 October 1947,

*The Nevada sex trade in contemporary context*

*Federal and international laws on sex trafficking*

71.     In 2000, Congress passed the Trafficking Victims Protection Act, the first comprehensive law in the United States to explicitly penalize the full range of human trafficking offenses, including sex trafficking.

72.     Congress reauthorized the law in 2003 as the Trafficking Victims Protection Reauthorization Act (TVPRA) and created a civil cause of action.  18 U.S.C. § 1595.

73.     Under the TVPRA, sex trafficking occurs if there is a commercial sex act involving a person under age 18 or a person induced by force, fraud, or coercion.[30]  This is considered a severe form of trafficking in persons under federal law.  22 U.S. Code § 7102 (11)(A).  Anyone who "recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means" or "benefits, financially" from sex trafficking can be held liable.

74.     Commercial sex act means "any sex act, on account of which anything of value is given to or received by any person."[31]

75.     Coercion includes "threats of serious harm to or physical restraint against any person; any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or the abuse or threatened abuse of law or the legal process."[32]

---

    (4) International Convention of 11 October 1933 for the Suppression of the Traffic in Women of Full Age, as amended by the aforesaid Protocol . . . .
*Id.* pmbl.
[30] 18 U.S.C. § 1591.
[31] *Id.* at § 1591(e)(3).
[32] *Id.* at § 1591(e)(2).

76.     Serious harm refers to "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm."[33]

77.     Section 1595 authorizes civil claims against sex trafficking perpetrators, as well as anyone who "knowingly benefits, financially or by receiving anything of value" from participating in what the person knew or should have known was a sex trafficking venture.[34]

78.     Prostitution continues to be against federal policy as a form of sexual exploitation that is linked to sex trafficking.[35]

79.     This is consistent with international law.  The 1949 UN Convention for the Suppression of the Traffic in Persons and of the Exploitation of the Prostitution of Others states that, "prostitution and the accompanying evil of the traffic in persons for the purpose of prostitution are incompatible with the dignity and worth of the human person," and forbids prostitution related activities, including exploiting "the prostitution of another person, even with the consent of that person."[36]

*Connections between prostitution and sex trafficking*

---

[33] *Id.* at § 1591(e)(5).
[34] 18 U.S.C. § 1595.
[35] *See, e.g.*, 22 U.S.C. § 7601 ("Prostitution and other sexual victimization are degrading to women and children and it should be the policy of the United States to eradicate such practices.").
[36] Convention for the Suppression of the Traffic in Persons and of the Exploitation of the Prostitution of Others, pmbl., Art. 1, July 25, 1951, 96 U.N.T.S. 271,
https://www.ohchr.org/en/professionalinterest/pages/trafficinpersons.aspx.

80.     It is also borne out by experience. Prostitution is associated with a high risk of sexual assault and other violence, predominately from sex buyers.[37]

81.     When prostitution is legal, it leads to increased sex trafficking to meet demand. This has occurred in Rhode Island and in the Netherlands.

82.     In Rhode Island, indoor prostitution was decriminalized from 1980-2009 and during that period of time the illicit trade exploded, and it heavily involved organized crime.[38]

83.     Brothels existed under the guise of spas and health services but were deeply intertwined with the international trafficking of Asian women.[39]

84.     Men visited these spas from nearby states in droves and their reviews of these places increased by 200% reflecting the explosion of the sex trade, especially in Providence.[40]

85.     The lack of regulations also meant that 16- and 17-year-olds were involved in these enterprises, police were unable to adequately investigate matters, and labor laws or code violations were insufficient ways to get at the more serious crimes.[41]

86.     Legalization in the Netherlands has also been ineffective at curbing illegal activities. In fact, the illegal industry flourishes, and the criminals who run those operations

---

[37] For example, a study of 562 women exploited in prostitution in Miami, Florida (USA) found the lifetime prevalence of abuse was extremely elevated at 88%, and 34% reported violent encounters with "dates" or clients in the prior 90 days. Serious mental illness among this population of prostituted women was quite common, with 74% reporting severe symptoms of depression, anxiety, or traumatic stress.  Hilary L. Surratt et al., *HIV Risk Among Female Sex Workers in Miami: The Impact of Violent Victimization and Untreated Mental Illness*, 24 AIDS CARE, 553-561 (2012).  Also, a study of homicide in the United States from 1970 to 2009 found that prostituted persons accounted for 32% of all cases of serial murder involving female victims only. The proportion of serial murders with female prostituted victims increased across the study period, from 16% during 1970-1979 to 69% during 2000-2009. Killers of prostituted women also amassed a greater average number of victims than do killers of other victim types and kill for slightly longer periods of time. Kenna Quinet, *Prostitutes as Victims of Serial Homicide: Trends and Case Characteristics, 1970-2009*, 15 HOMICIDE STUDIES 74-100 (2011).
[38] Melanie Shapiro & Donna M Hughes, *Decriminalized Prostitution: Impunity for Violence and Regulation*, 52 WAKE FOREST L. REV. 534 (2017).
[39] *Id*. at 545. In fact, the largest mafia bust in FBI history resulted from infiltration of these brothels and led to the arrest of over 127 people from seven crime families including the Gambinos, with extortion efforts totaling up to 1.5 million dollars. *Id*. at 547.
[40] *Id*. at 540.
[41] *Id*. at 552-555.

also participate in the legal industry, which further provides cover for their illicit activities.[42] Multiple studies out of the Netherlands indicate organized crime permeates it, and conclude that it is impossible to eliminate, or even reduce, the criminal aspects of the sex trade.[43] These conclusions have led legislators to consider new approaches and revamp their existing policies.[44]

87.    In Nevada, the signs point to the same conclusion. In the United States, it is believed that illegal prostitution generates over 14 billion dollars of revenue.[45] Of that, 5 billion is generated in Vegas alone,[46] even though prostitution is not legal in Las Vegas. Legal brothels are reported to provide 75 million dollars of revenue for the state.[47] But they do so much more, they allow the sex trade to flourish all over the state and become a part of tourist expectations, which furthers growth of state revenue. In other words, the legal trade correlates with exponential increases in the illegal trade and state cash flow.

88.    The legal trade also correlates with an increase in sex trafficking: two multi-country studies have concluded that wherever there is legal or decriminalized prostitution, human trafficking increases. One study compared 39 nations and the other was more expansive, assessing 150 countries, and both found a relationship between prostitution laws and sex trafficking.[48]   Sex trafficking is greater in countries where prostitution is legal or

---

[42] Sheila Jeffreys, *Brothels Without Walls: The Escort Sector as a Problem for the Legalization of Prostitution,* 17 SOC. POL.: INT'L STUD. GENDER, ST., SOC'Y 210 (2010).

[43] Karin Werkman, *Briefing on Legal Prostitution in The Netherlands: Policies, Evaluations, Normalisation,* June 2016,          feminismandhumanrights.files.wordpress.com/2014/06/karin-werkman-2016-briefing-on-legal-prostitution-in-the-netherlands.pdf (last visited Sep. 9,2021).

[44] Jeffreys, *supra* note 40, at 11.

[45] Prostitution Revenue by Country, HAVOCSCOPE, https://www.havocscope.com/prostitution-revenue-by-country/3809085/ (last visited July 14, 2021).

[46] Ronald B. Flowers, *Prostitution in the Digital Age: Selling Sex from the Suite to the Street* 42-46 (2011).

[47] *Id.*

[48] Niklas Jakobsson & Andreas Kotsadam, *The Law and Economics of International Sex Slavery: Prostitution Laws and Trafficking for Sexual Exploitation*, 35 EUR. J. L. AND ECON. 1 (2013); Seo-Young Cho, Axel Dreher, & Eric Neumayer, *Does Legalized Prostitution Increase Human Trafficking*?, WORLD DEV. 41 (2013).

1  decriminalized.[49]

2  *Nevada's legal norms and sex trafficking*

3         89.     In the United States, Nevada stands alone in maintaining legalized prostitution,

4  in apparent defiance of the legal and human rights norms and data described above.

5         90.     While Nevada has allowed brothel operation since the nineteenth century, the

6  first officially sanctioned brothel, Mustang Ranch, was licensed by Storey County in 1971.

7         91.     Nevada then enacted Nev. Rev. Stat. § 244.345(8), legalizing prostitution in

8  county-licensed brothels, for counties with fewer than 200,000 residents.

9         92.     Prostitution is now permitted in counties that have fewer than 700,000

10  residents, and Nevada currently has legal brothels in seven counties:  Elko,[50] Lander,[51] Lyon,[52]

11  Mineral,[53] Nye,[54] Storey,[55] and White Pine.[56]

12         93.     State regulations force women in prostitution to get tested for sexually

13  transmitted infections every week.  Nev. Admin. Code § 441A.800.

14         94.     Nevada does not require sex buyers to undergo any similar testing. Not unlike

15  the Contagious Diseases Act in nineteenth-century Great Britain described above, the one-

16  sided testing protects the sex buyer and compounds the harm and burden on the prostituted

17  persons.

18         95.     Nevada also permits cities and counties to license escorting, and what it terms

19

20  _____
   [49] *Id.*
   [50] Elko, Nev., County Code, "Sexually Oriented Businesses and Employee Licensing Chapter," §6-11 (2020).
21  [51] Lander, Nev., County Code, "Prostitution," §5.16 (2020).
   [52] Lyon, Nev., County Code, "Lyon County Brothel Ordinance," §5.03 (2020).
22  [53] Mineral, Nev., County Code, "Prostitution," §5.12 (2019).
   [54] Nye, Nev., County Code, "Prostitution," §9.20 (2020).
   [55] Storey, Nev., County Code, "Brothels," §5.16 (2015).
23  [56] White Pine, Nev., County Code, "Prostitution," §10.36 (2021) (disallowing prostitution in unincorporated areas
   of White Pine, but allowing such activity within the incorporated areas).  *See* City of Ely, Nev., City Ordinance,
24  "Prostitution," §3.6 (2020) (city within White Pine County explicitly authorizing prostitution).

"entertainment by referral service," defined as follows:

(a) "Entertainer for an entertainment by referral service" means a natural person who is sent or referred for a fee to a hotel or motel room, home or other accommodation by an entertainment by referral service for the purpose of entertaining the person located in the hotel or motel room, home or other accommodation.

(b) "Entertainment by referral service" means a person or group of persons who send or refer another person to a hotel or motel room, home or other accommodation for a fee in response to a telephone or other request for the purpose of entertaining the person located in the hotel or motel room, home or other accommodation.

Nev. Rev. Stat. § 244.345(8).

96.     Nevada permits counties to self-regulate as to prostitution.  In Storey County, the local brothel owner is also a county commissioner who sits on the brothel board, the government entity that supposedly regulates the brothels.[57]

97.     In the legal brothels, women are commonly subjected to a number of practices that amount to debt bondage, including:

- Being locked inside the brothels and not allowed to leave for weeks at a time;

- Having to give the brothel 50% of their earnings;

- Being required to follow the brothel's rules or face fines; and

- Being forced to live on the premises and pay the brothels for room and board to do so.

---

[57] *See* Storey, Nev., County Code, "Brothels," § 5.16.

98.     Most Nevada brothels are located in the middle of the desert – that is, in extremely remote locations, with few trees or spaces where a person would not be almost immediately visible, and often without meaningful access to public transportation. Some are also surrounded by high fences.

99.     The practices described above are inherently coercive, particularly given the geographic context, and lead to women in prostitution owing the brothels money and being held in debt bondage in legal Nevada brothels.

100.    Many women prostituted in Nevada brothels are controlled by outside pimps, in addition to brothels themselves, which also act as pimps.

101.    One federal court acknowledged this problem recently, citing a study that found that pimps remained common and some assaults against prostituted women occurred within Nevada's legal brothels.  *Coyote Publishing, Inc. v. Miller*, 598 F. 3d 592, 596 n.2 (2010).

102.    And in 2018, the Lyon County Sheriff's Office conducted multiple brothel work card compliance checks, assisted by U.S. Immigration and Customs Enforcement officials. They found numerous illegal practices, including immigration law violations, fraudulent statements, and sex trafficking indicators.[58]

103.    Prostitution is legal in Nye County, which is just outside Las Vegas.

104.    The Nye County Code states that solicitation is illegal unless it occurs within a legal brothel.  Nye Co. Code § 9.20.160.

105.    The Nye County Code defines solicitation as someone who offers to engage in prostitution, or who "[i]nduces, persuades, encourages, inveigles or compels" someone else to do so.  Nye Co. Code § 9.20.020.

---

[58] Lyon County Sheriff's Office, *Internal Audit Report on Brothel Compliance Requirements* (2018).

106.   The Nye County Code does not define "compel."

107.   By implication, Nye County does not ban compelling prostitution as long as the perpetrator does so in a legal brothel.

108.   Compelling someone to engage in prostitution violates federal law, which bans sex trafficking, including coercing people into commercial sex acts.

109.   The Nye County brothel licensing board *may* refuse to grant a brothel license to someone who has been convicted of a felony, has a financial interest in an illegal prostitution business, is under twenty-one years old, or who has had a previous brothel license revoked for cause, but *is not required* to do so.  Nye Co. Code § 9.20.120.

110.   Prostitution is officially illegal in Las Vegas, though this is more pretense than reality.

111.   Las Vegas has legalized escorts and escort bureaus.  Las Vegas, Nev., Mun. Code § 6.36.010 (2020).

112.   Escorting is a common front for prostitution.  Defendant City of Las Vegas is aware of this, noting in its own code the need to prevent prostitution without implicating "free expression."  Las Vegas, Nev., Mun. Code § 6.57.010. [59]

113.   Escorts may not operate independently, but are forced by law to be managed by an escort agency, and only one at a time.  *Id.* § 6.36.170, 6.36.190.

114.   By city regulation, escorts must submit to medical testing and provide "written evidence" from a physician who has deemed them "free from any communicable diseases"

---

[59] The Clark County ordinances are more explicit about this compromise: "The cover of the First Amendment has materially increased the burden of policing this business to decrease the incidence of prostitution and drug sales." Las Vegas is located in Clark County.  The ordinances for Clark apply to the unincorporated parts of the county. *See* Clark, Nev., County Code § 6.140 (2021).

twice a year to maintain work card status.  *Id.* § 6.36.160.[60]  No such requirement is imposed on the men who patronize the escorts.

115.    Clark County, where Las Vegas is located, also has ordinances licensing escort businesses,[61] as well as regulations licensing outcall entertainment.[62]

116.    Similar to the state statute, Clark County defines the latter as follows:

> "Outcall" or "entertainment by referral" service means a person or group of persons who send or refer another person to a hotel or motel guest room for a fee in response to a telephone call or other request for the purpose of entertaining the person located in the hotel or motel guest room.[63]

117.    Clark County criminalizes prostitution.[64]

118.    Legalized prostitution increases the demand for commercial sex, and men travel to Nevada to buy sex because they incorrectly believe it is legal throughout the state.

119.    The sex industry exploits this misconception with impunity, that is, by operating both legal and illegal entities that violate federal laws against debt bondage and sex trafficking, without facing any meaningful enforcement from Nevada.

120.    Prostitution advertising, for both legal and illegal prostitution in Nevada, is pervasive online, and directed toward people outside the counties where prostitution is legal.

121.    On information and belief, many men who buy women for sex come from out-of-state, many of them induced by online advertising and marketing.

---

[60] *See also* City of Las Vegas Department of Planning Business Licensing Division, *Checklist/Instructions – Escort Bureau – Form PL056* (revised Apr. 11, 2016), https://files.lasvegasnevada.gov/business-licensing/Escort-Bureau-Web-Instruction-Sheet.pdf.
[61] *See* Clark, Nev., County Code §§ 8.32.010-150 (2021).  Clark County distinguishes between "service-oriented" and "sexually-oriented" escort businesses, *See* Clark, Nev., County Code §§ 8.32.160 and provides that licenses may be denied to participants in sexually oriented escorting, id at §§ 8.32.80, 140, but does not actually require denial.
[62] *See* Clark, Nev., County Code §§ 6.140.030-140 (2021).
[63] *See* Clark, Nev., County Code § 6.140.020 (2021).
[64] *See* Clark, Nev., County Code § 6.140.150 (2021).

122.    On information and belief, Nevada does not enforce the advertising regulations, Nev. Rev. Stat. §§ 201.430; 201.440, that outlaw prostitution advertisements outside the counties that permit brothels.

123.    Nevada itself has acknowledged this problem, submitting a federal grant application for combating sex trafficking, admitting that the state is "a major national and even global destination, because Nevada is also synonymous with legalized gambling, legalized prostitution, clubbing, partying, bars, strip clubs, celebrities, glamour and gaudy excess – a grand spectacle of legitimized sin 24/7, 365 days per year!"  The application also noted that prostitution is not "universally legal in Nevada," despite visitors' belief otherwise, and:

> Nevada's legal brothels complicate development of a consistent statewide response to sex trafficking . . . Nevada's recognition as one of the top trafficking destinations by multiple government and non-profit advocacy agencies is earned by effectively marketing the state's entertainment and fantasy fulfillment possibilities.[65]

124.    Nevada criminalized sex trafficking in 2013.

125.    Nevada had 4 new federal sex trafficking prosecutions in 2020, for a total of 9 active cases (compared to 7 in the District of Columbia, 30 in Illinois, 44 in New York, and 61 in Texas), and 0 sex trafficking convictions (out of more than 150 nationwide).[66]

126.    While these numbers may seem reflective of Nevada's relatively small population (3 million residents),[67] they are disproportionately low given Nevada's extremely high tourism numbers:  in 2018, Las Vegas had 42.1 million visitors (compared to 21.8 million

---

[65] OVC FY 2014 Services for Victims of Human Trafficking Grant Application Nevada Office of the Attorney General – Program Narrative.

[66] *See* Kyleigh Feehs & Alyssa Currier Wheeler, *2020 Federal Human Trafficking Report*, https://www.traffickinginstitute.org/wp-content/uploads/2021/06/2020-Federal-Human-Trafficking-Report-Low-Res.pdf.

[67] *Nevada Population,* POPULATIONU, www.populationu.com/us/nevada-population (last visited Aug. 9, 2021).

1  in Boston, 22.8 million in Washington, DC, 53 million in Atlanta, 57.6 million in Chicago, and

2  65.2 million in New York City).[68]

3        127.    On information and belief, Nevada's economy relies heavily on tourism.  The

4  top 15 employers in Clark County in 2020 were all either departments run by city officials or

5  casinos/resorts (with the exception of Nellis Air Force Base).[69]

6        128.    Nevada has had significant problems with government corruption, ranking 46

7  out of 50 states and receiving an "F" grade on the Center for Public Integrity's State Integrity

8  Investigation in 2015.[70]

9        129.    Over the last several years, federal corruption probes have investigated

10  Nevada's then-governor,[71] and the Las Vegas Metropolitan Police Department – specifically

11  for collaborating with the pimps/sex traffickers they were supposedly investigating.[72]

12        130.    On information and belief, there is no state-reported data on sex trafficking

13  investigations, prosecutions, or convictions under state law.

14        131.    On information and belief, Nevada does not aggressively prosecute sex

15  trafficking.

16

17  _____

18  [68]  *America's 30 Most Popular Cities for Tourists 2019*, BEST CHOICE REVIEWS, www.populationu.com/us/nevada-population (last visited Aug. 9, 2021).

19  [69] *See Comprehensive Area Financial Report*, NEV. LAB. MKT. INFO., https://nevadaworkforce.com/CAFR (last visited Sep. 7,2021). With the exception of the University of Nevada, the top 15 employers for the whole state are exclusively state and local government entities, and casinos/resorts. *20 Largest Employers in Nevada*, NEV. DEP'T OF EMP'T, https://www.nevadaresorts.org/benefits/largest-employers-full.php.

20  [70] *See* Center for Public Integrity, *Nevada Gets F Grade in 2015 State Integrity Investigation* (Nov. 12, 2015, 12:01 PM), https://publicintegrity.org/politics/state-politics/state-integrity-investigation/nevada-gets-f-grade-in-2015-state-integrity-investigation/.

21  [71]    *See Attorney: Nevada Governor Cleared in FBI Probe* (Nov. 2, 2008, 5:25 PM), https://www.nbcnews.com/id/wbna27507509;

22  [72] *See* George Knapp and Matt Adams, *I-Team: Former cop, suspected pimp linked together in FBI investigation,* 8 News Now (Nov. 11, 2016, 12:40pm), https://www.8newsnow.com/news/i-team-former-cop-suspected-pimp-linked-together-in-fbi-investigation/607916728/; George Knapp and Matt Adams, *I-Team: Explosive Testimony in Police Corruption Case,* 8 News Now (Nov. 17, 2018, 8:08 AM), https://www.8newsnow.com/news/i-team-explosive-testimony-in-police-corruption-case/859451936/; Dana Gentry, *Cops, pimps winners in FBI Probe,* Nevada Current (Oct. 31, 2019), https://www.nevadacurrent.com/2019/10/31/cops-pimps-winners-in-fbi-probe/.

132.    Yet Nevada's sex trade is disproportionately large; sex trafficking reports in Nevada are out of proportion with the state's small population size.

133.    Nevada's legal brothels generate an estimated $75 million dollars per year, a figure dwarfed by the $5 billion a year Nevada's illegal sex trade generates.[73]

134.    The state government receives revenues from prostitution occurring through escort agencies, as it taxes escort agencies 9% of their fees under the state live entertainment tax, Nev. Rev. Stat. § 368A.010–368A.370.

135.    Local governments with legal brothels receive revenues from brothel taxes and fees.

136.    Nevada does not enforce its limited regulation of prostitution, permitting de facto prostitution to exist through escort bureaus and entertainment by referral service, failing to implement or enforce laws limiting prostitution advertising, and failing to prevent the resultant debt bondage in legal brothels.

137.    Nevada allows not only prostitution within legal and rural brothels, but also escorting and "outcall entertainment" – effectively legalizing prostitution throughout the state – directly for small towns and counties, and through euphemism and inaction in the rest, without meaningful prevention or accountability for the severe forms of sex trafficking occurring in the Nevada sex trade.

*Plaintiffs' exploitation in the sex trade*

138.    Plaintiffs Angela Williams and Jane Doe were both induced through force, fraud, and coercion into providing commercial sex acts in Nevada's legal sex industry,

---

[73] Flowers, *supra* note 47.

including legal escort agencies, legal strip clubs, and a legal brothel.

*Plaintiff Angela Williams*

139.    Plaintiff Angela Williams was sex trafficked in Nevada from 2006 to 2017.

140.    Ms. Williams lived on her own as a seventeen year old in Houston. She came from an economically marginalized family and neighborhood, worked two jobs to support herself and was attending college.

141.    During this vulnerable time in her life, Ms. Williams 's first trafficker, Andre McDaniels, introduced himself as a "friend," worked to gain her trust, and enticed her to go to his "modeling studio."

142.    Ms. Williams later learned that McDaniels's studios[74] were illegal brothels disguised as lingerie modeling studios.

143.    Ms. Williams did not know what a pimp was, and believed sex-trafficked women were streetwalkers only. She just thought Mr. McDaniels was a rich older man that had other girls from Ms. Williams's high school working for him who could afford to move away from their poor childhood neighborhoods.

144.    The other high school peers that "worked" for Mr. McDaniels did not initially disclose to Ms. Williams what they were doing at the "modeling studios."

145.    Ms. Williams later learned that some of the girls who worked for Mr. McDaniels, who was 36, were seventeen years old or younger.

---

[74] On Monday, January 7, 2013, McDaniels was ordered to serve 96 months in federal prison for his convictions of conspiracy to commit sex trafficking, one count of coercion and enticement, and two counts of transportation in relation to Operation Total Exposure, at the time, the largest domestic sex trafficking case in the Southern District of Texas. *Three Sentenced in Massive Domestic Sex Trafficking Case*, USAO S. D. TX (Jan. 7, 2013) https://www.justice.gov/usao-sdtx/pr/three-sentenced-massive-domestic-sex-trafficking-case. Mr. McDaniels was shortly thereafter convicted for witness tampering in connection to the same case. *Witness Tampering Lands Convicted Sex Trafficker More Prison Time,* USAO S.D. TX (June 26, 2013), https://archives.fbi.gov/archives/houston/press-releases/2013/witness-tampering-lands-convicted-sex-trafficker-more-prison-time.

146.    Mr. McDaniels continued to groom Ms. Williams until she was eighteen, then increased his recruitment tactics.

147.    He showered Ms. Williams with attention, supplied her with marijuana, spending thousands of dollars on lingerie for her, and convincing her to change her appearance, such as her hair color.

148.    Mr. McDaniels completely isolated Ms. Williams from friends and family.

149.    Eventually, through fraud and coercion, Mr. McDaniels brought Ms. Williams to his "modeling studio."

150.    The other women and girls who worked for Mr. McDaniels eventually manipulated Ms. Williams into believing that prostitution was glamorous and that "working" for Mr. McDaniels was not different than anything she would do for any other boyfriend, except she would get paid extremely well.

151.    In the beginning, due to the systemized coercion and dehumanization, Ms. Williams minimized the trauma of performing sexual acts on sex buyers since she was surrounded by other young women sex trafficked by Mr. McDaniels and his brothers.

152.    Ms. Williams was swiftly forced into performing hand jobs on sex buyers before she could make sense of the details.

153.    Ms. Williams started out by performing hand jobs, and eventually the sex buyer would complain, and another girl would come in the room to finish the service the sex buyer desired, whether it was vaginal or anal sex.

154.    Ms. Williams did not even know how to perform some of the sexual positions the sex buyers were demanding.

155.    Mr. McDaniels continued to manipulate and groom Ms. Williams by giving her

special treatment and hiding the fact that the sex buyers were unhappy with Ms. Williams being

uncomfortable performing sexual acts such as vaginal or anal sex on sex buyers.

156.    Ms. Williams was always the last one to come to the lineup, hoping that a sex

buyer would see a different sex trafficked woman first, so she would not have to perform sexual

acts.

157.    Mr. McDaniels would tell some of the sex buyers that Ms. Williams was

underage. One sex buyer actually paid Ms. Williams to dress like a cheerleader and meet him

at the high school bleachers.

158.    Despite her distress and unwillingness, Ms. Williams was eventually coerced

into performing any sex act requested by the sex buyer.

159.    Ms. Williams was confused and afraid.

160.    As is common with grooming,  suddenly, just like the rest of the girls working

for Mr. McDaniels, Ms. Williams no longer received special treatment and was forced to give

all the money she earned from sex buyers to Mr. McDaniels.

161.    Ms. Williams was not permitted to leave the illegal brothels for periods as long

as 24 hours.

162.    Ms. Williams was only permitted to go "home" from the "modeling studio" to

the shared living quarters where all the women and girls being sexually exploited by Mr.

McDaniels were forced to live on Sundays, and sometimes not at all. The women and girls in

the shared living quarters were permitted few personal items, except for lingerie.

163.    Ms. Williams was able to break free from Mr. McDaniels, but then ended up

stripping at a strip club chain in Houston, Texas.

164.    The Houston strip club generally encouraged prostitution and sex trafficking

1   within the clubs.

2       165.    While Ms. Williams was at the Houston strip club, the club knew she was a

3   victim of human trafficking and sold her for sex in the club.

4       166.    Ms. Williams was introduced to a very violent trafficker through the Houston

5   strip club.

6       167.    While under the sexual servitude to the violent trafficker, Ms. Williams began

7   browsing classified ads in an effort to escape.

8       168.    In or around early 2006, Ms. Williams responded to an advertisement for a job

9   posted by Tarnita Woodward, an employee of Jamal Rashid, also known as "Mally Mall."

10      169.    Mr. Rashid owned many escort businesses, some of them shell corporations to

11  disguise his escort services, including Defendants Exclusive Beauty Lounge, LLC, E.P.

12  Sanctuary, First Investment Property LLC, V.I.P. Entertainment, LLC, and listed Ms.

13  Woodward as the registered owner of many of these companies.

14      170.    Mr. Rashid's other corporations received profits from his escort companies.  On

15  information and belief, Mr. Rashid's other businesses that benefited from his sex trafficking

16  business include Defendants PF Social Media Management, LLC, Mally Mall Music, LLC,

17  Future Music, LLC, , Blu Magic Music, LLC,; MP3 Productions, Inc., and MMM Productions,

18  Inc.

19      171.    Ms. Williams was hired to work for one of Mr. Rashid's companies, VIP

20  Entertainment, which was a licensed escort business in Las Vegas.

21      172.    Mr. Rashid had three offices in Nevada over a fifteen-year period, all registered

22  to his various entertainment businesses.

23

24

173.    Mr. Rashid, who has ties to organized crime, was on the City of Las Vegas's payroll as an informant, and also paid large sums of money to the City for protection.

174.    In 2014, the FBI raided Mr. Rashid's home during the corruption investigation referenced above.   In 2019, the FBI again raided Mr. Rashid's home, in an apparent sex trafficking and animal trafficking investigation.

175.    The City of Las Vegas knew Mr. Rashid was an active sex trafficker.

176.    Ms. Williams was required to obtain a work card from the Clark County Sheriff's Office by one of the escort agencies.

177.    VIP Entertainment enticed Ms. Williams to travel across state lines from Texas to Las Vegas, Nevada to be sex trafficked, under the guise of upscale escorting, because the demand for prostitution was so high in Nevada.

178.    Mr. Rashid used fraud to entice the women working for him into thinking that the work performed was glamorous, and that the women were like "Playboy Bunnies," and he was like Hugh Hefner.

179.    In the beginning, Mr. Rashid allowed Ms. Williams to keep 30% of any monies earned from the escort services and required her to give him the remaining 70%.

180.    Eventually, Mr. Rashid designated Ms. Williams as a "priority girl," and forced her to give him 100% of what she earned.

181.    He claimed this was necessary to take care of Ms. Williams's living expenses.

182.    Mr. Rashid was entering the music industry, and he was recognized as a major pimp in the illegal sex trade in Las Vegas, Nevada, where he began sending Ms. Williams in fall 2006.

183.    Mr. Rashid and his employees began to control every aspect of Ms. Williams's

money, from booking her rooms when she traveled and providing her a small allowance to cover food and a hotel while she was traveling for commercial sex acts outside Nevada, to controlling what she was allowed to wear.

184.   Ms. Williams was required to go to whatever house or hotel Mr. Rashid provided and sleep. She had to be hair and make-up ready by 3:00pm.

185.   Her shifts were 4:00pm-12:00am (swing) and 12:00-8:00am (grave). If sex buyers were on cocaine, Ms. Williams would be required to continue into the day.  She would have to remain with the sex buyer until she was relieved.

186.   Ms. Williams was not allowed to leave the sex buyer, even if she felt her life was in danger. She was not allowed to leave the room, until she was cleared by one of the managers/ assistant traffickers.

187.   Ms. Williams was forced to service sex buyers who abused her in the past.  In one case, Ms. Williams stated:  "I don't want to see him; he is a pervert," and was not permitted to decline.

188.   To be cleared to leave the sex buyer, Ms. Williams had to tell the manager, in front of the sex buyer, "I am leaving," and disclose the full amount of money she had received, which meant saying aloud if she had received a tip, which the manager would take as well.

189.   Ms. Williams was sometimes kicked out of buildings by security personnel, who would require her to use a different entrance, even if that would jeopardize her safety. Ms. Williams was sometimes arrested for trespassing.

190.   The managers would yell at Ms. Williams. If managers decided Ms. Williams and the other exploited women and girls were not being sufficiently subservient, they would not eat well.

191.   Ms. Williams would often get home at 9:00am, and have six hours to sleep, eat, run errands, and then be hair and makeup-ready by 3:00pm.

192.   The sex trafficking ring guised as a legal escort service was successfully and strategically planted in Las Vegas to intercept sex tourists planning to travel to the nearby cities of Pahrump or Crystal where the closest legal brothels were located.

193.   The escort service trafficked Ms. Williams by plane from Las Vegas, Nevada to perform sex acts for money in large cities such as Dallas, Los Angeles, Chicago, and Boston.

194.   Most of the Las Vegas sex buyers were under the misconception that prostitution was legal in all of Nevada, including Las Vegas, and the escort service took advantage of this misconception.

195.   Ms. Williams most frequently interacted with sex buyers who traveled across state lines to Nevada for the sole purpose of purchasing sex, whether it was for a newly divorced party, a bachelor party, or a corporate CEO wishing to privately cheat on his wife.

196.   Ms. Williams knew numerous women in the sex industry who were trafficked and sexually exploited in the legal brothels.

197.   Ms. Williams was arrested as a result of being trafficked for purposes of prostitution.

198.   When Ms. Williams was on probation for her prostitution charges, Mr. Rashid coerced her to violate her probation by continuing to sell sex, by assuring her that he had a "dream team" of lawyers that could get them out of anything.

199.   Mr. Rashid used the money from sex trafficking the women to pay for his music production. Mr. Rashid has worked for Grammy award-winning artists, and lived in a multi-million-dollar home in Encino, California.

200.    Mr. Rashid was sentenced to prison in May 2021 for unlawfully operating a prostitution business.

201.    Eventually, Ms. Williams was arrested by Chicago police while being sex trafficked by Mr. Rashid's company. Ultimately, Ms. Williams served 13 months in jail.

202.    After serving her time, Mr. Rashid tried to recruit Ms. Williams to return back to his escort business.

203.    Ms. Williams moved to Los Angeles, California, where Mr. Rashid had multiple community apartments for the women and girls who worked for him to use while they were traveling to be bought for sex from sex buyers or for escort services.

204.    While in Los Angeles, California, Mr. Rashid forced Ms. Williams to perform oral sex on him.

205.    While working for Mr. Rashid, Ms. Williams understood that she belonged to "the Game" and/or the "Pimp and Ho" subculture. Ms. Williams was threatened and brainwashed into believing that if she were to prostitute as a "free agent" or without the representation of a trafficker that she would be opening herself up to be assaulted or robbed by sex buyers, or to worse treatment by another sex trafficker.

206.    Mr. Rashid tore down Ms. Williams's identity and self-worth so much that he made her believe the only "job" she would ever be able to obtain was one where she sold sexual acts to sex buyers.

207.    Eventually after going back and forth between being sex trafficked by Mr. Rashid and working in the strip clubs, Ms. Williams met her final trafficker through a contact from Moonshine and Candy Apple Girls escort agency. Her final trafficker trafficked Ms. Williams through the strip clubs again, including the Sapphire in Las Vegas.

208.    Ms. Williams's final sex trafficker came to her with empty promises of love, and of retiring her from being a sex trafficked woman.

209.    Ms. Williams became frightened when she realized her final sex trafficker was extremely abusive.

210.    When Ms. Williams would try to escape from him, he would severely physically assault her.

211.    Ms. Williams escaped from her final sex trafficker in 2017.

212.    After Ms. Williams escaped she moved to a condominium in Las Vegas, Nevada that lacked security. One morning Ms. Williams's final sex trafficker came to her doorstep with a bouquet of roses and tried to kill her.

213.    After almost losing her life, Ms. Williams was able to escape the grip of sex traffickers.[75]

214.    Though Ms. Williams suffers from post-traumatic stress disorder from her near-death assault when her sex trafficker attempted to kill her, she suffers more from the flashbacks of her memories of being sold and exploited by sex buyers.

215.    To this day, Ms. Williams still suffers from the trauma of being sex trafficked. She cannot enjoy the relaxation of a normal vacation with her family because of the violence she experienced in hotel rooms across this country, the majority of which occurred in Las Vegas.

---

[75] On May 22, 2018, Tyree Wright was sentenced to serve nine and a half (9 ½) years in prison for his charges of sex-trafficking, second degree kidnapping, and battery with use of a deadly weapon resulting in substantial bodily harm. Brenda Yahm & Adam Herbets, *Valley victim confronts abusive pimp during his sentencing,* Fox 5 KVVU TV (May 22, 2018), https://www.fox5vegas.com/news/valley-victim-confronts-abusive-pimp-during-hissentencing/article_ec3c3c29-9355-5664-b58d-3b50b1e5ed69.html.

216.    Nevada was a regular location for Ms. Williams to be sex trafficked. No matter where her traffickers would take her, they would always return to Nevada to sell Ms. Williams, and others similarly situated to her, because Nevada is the state where there was and is the greatest demand for prostitution, whether legal or illegal.

*Plaintiff Jane Doe*

217.    Plaintiff Jane Doe was sex trafficked in Nevada from 2013 to 2018.

218.    Jane Doe experienced homelessness, being placed in the foster care system, and sexual abuse as a child, including statutory rape by a man 13 years older than her, who left her pregnant at the age of 15, while a ward of the court.

219.    The abuser used pornography to groom Jane Doe from age 14, including the 2005 film, "Boss'n up."  The abuser also created pornography of Jane Doe.

220.    At 18, Jane Doe moved in with the abuser, and within six months had entered a domestic violence shelter with her child, pregnant with her second child.  Thereafter, Jane Doe was chronically homeless, going from shelter to shelter and program to program while fighting her abuser for child custody.

221.    Due to Jane Doe being sex trafficked and her absence at the family court date, the custody judgment went into default and the abuser gained full custody of their children. That abuser made false allegations against Jane Doe in family court, causing her to lose her welfare income, subsidized housing, and financial aid for college. He retains custody of their children.

222.    Jane Doe was thereafter introduced to prostitution by a family member who induced her to travel to Las Vegas, promising that it would be a way to quickly make money for a lawyer and Jane Doe's other emergency needs.

223.    That family member was also being sex trafficked by multiple pimps, and married one of them.

224.    Jane Doe was introduced to at least three other pimps in 24 hours, who all sex trafficked her.

225.    Paying cash to multiple pimps/traffickers at once violates the "rules" of pimping, and when some of the pimp/traffickers found out, they brutally beat both Jane Doe and her aunt.

226.    The sex trafficker that Jane Doe ended up with was a guerilla pimp, that is, one that uses extreme violence, including torture, to force persons under his control to engage in prostitution.

227.    Jane Doe was sex trafficked by the guerilla pimp in Las Vegas street prostitution.

228.    Jane Doe was subjected to extreme violence, as well as starvation and confinement – forms of torture – by the guerilla pimp, who was also a gang member, who was prostituting her.

229.    Jane Doe escaped the guerilla pimp and was then sex trafficked by a "Romeo" pimp – an exploiter who coerces through romance, affection, instilling a sense of family obligation, and other forms of predominantly psychological manipulation.

230.    Jane Doe was subjected to physical violence by the "Romeo" pimp, Khalieff "Leef" Wilson, on at least one occasion, for breaking one of his marijuana drug "rules."

231.    The "Romeo" pimp renamed Jane Doe and in addition to Nevada, required her to travel through the United States to prostitute for him in New York, New Jersey, Colorado, Oregon, Texas, New Mexico, California, Oklahoma, Arizona, Georgia– much of it with racial

1   overtones.

2   232.   Mr. Wilson required this travel to maximize his profits from Jane Doe's

3   prostitution and to reduce the chances that they would be arrested.

4   233.   Jane Doe was sex trafficked in multiple venues, including casinos, executive

5   offices, truck stops, brothels, agencies, outcall/incall to sex buyers' preferred locations, hotels,

6   underground business pubs, restaurants, and massage parlors.

7   234.   Jane Doe frequently encountered violence from sex buyers, including a sex

8   buyer who threatened her with a gun, a couple that decided they wanted their money back after

9   Jane Doe performed sexual services on them, and a sex buyer who discussed a serial killer of

10   prostituted women in Albuquerque, while Jane Doe was servicing him at the Albuquerque

11   airport hotel.

12   235.   Mr. Wilson was eventually arrested for sex trafficking a minor for prostitution,

13   convicted, and sentenced to prison.

14   236.   Jane Doe remained under Mr. Wilson's control even while Mr. Wilson was in

15   prison, continuing to give him part of the money she made through prostitution, until 2015.

16   237.   While Mr. Wilson was in prison, Jane Doe engaged in prostitution through

17   escort agencies that would arrange her hotels and travel, screen her calls for sex buyer

18   bookings, and give information on locations, in exchange for fees and splits of the money Jane

19   Doe would make.

20   238.   Jane Doe also fell under the control of additional madam pimp, Nicole Flowers.

21   Ms. Flowers was associated with a travel agency that posted ads on craigslist to attract escorts.

22   Ms. Flowers primarily relied on psychological means of coercion, including engaging in

23   prostitution herself, and took portions of the money that Jane Doe was not giving to Mr.

24

1  Wilson.

2      239.    If Ms. Flowers provided transportation, room, supplies, photos, call screening,

3  and advertisements for two weeks, Jane Doe was required to work two weeks in the state of

4  Ms. Flowers' choosing.

5      240.    Jane Doe became engaged in legal brothel prostitution at the Chicken Ranch

6  while being pimped by Mr. Wilson and Ms. Flowers.

7      241.    Jane Doe was required to obtain a Sheriff's Work Card from the Nye County

8  Sheriff's Office to be prostituted at the Chicken Ranch.

9      242.    The Sheriff's office did not ask for a government ID or attempt to verify Jane

10  Doe's age or consent, nor did it attempt to determine whether she was under the control of a

11  pimp/trafficker.

12      243.    Jane Doe did not have a government ID when she obtained her Sheriff's Work

13  Card to work in the legal brothel. One of Jane Doe's earlier pimp/traffickers took away her

14  identification as a scare tactic, and to keep her from leaving, threatening to locate and harm

15  her children and family.

16      244.    The Sheriff's Work Card did not display Jane Doe's age.

17      245.    The brothel did not attempt to verify Jane Doe's age or consent, nor did it

18  attempt to determine whether she was under the control of a pimp/trafficker.

19      246.    The brothel was aware that many women being prostituted at the brothel were

20  under the control of pimps/traffickers.

21      247.    Jane Doe witnessed pimps/traffickers at the brothel.   She also witnessed

22  recruitment at the brothel.

23      248.    The brothel was aware that many persons being prostituted at the brothel were

24

under 21 years old.

249.     Jane Doe witnessed minors being prostituted at the brothel, including minors who had not yet reached their teens.

250.     Jane Doe was not permitted to have visitors at the brothel, unless they were sex buyers.

251.     The brothel arranged and controlled arrival and departure times for the prostituted women.

252.     Jane Doe was picked up by the brothel's transportation system in Las Vegas, and transported to Pahrump, Nevada.

253.     Sex buyers at the brothel paid via the brothel's website, or the ATM/card reader at the brothel itself.  The brothel then paid Jane Doe, after taking out various amounts, at the end of the two-week period.

254.     Jane Doe was required to give the brothel 50% of what she earned.

255.     Jane Doe was also required to pay the brothel for room and board, roughly $250 per week, as well as $50 each way for any transportation to or from the brothel.

256.     Jane Doe was required to pay the brothel around $120 monthly for the weekly medical exams.

257.     Jane Doe gave any remaining money to her two pimps, Khalieff Wilson and Nicole Flowers.

258.     Jane Doe was not permitted to leave the brothel during her two-week shifts, even to run errands; women prostituted in the brothel were locked inside, and did not have keys, and had to sign out before leaving the brothel at the end of a two-week shift (unless extending her contract for another two weeks).

259.   Jane Doe was not permitted to leave the brothel if she owed the brothel money, which happened at least one time.  A friend from the same brothel paid the bill for her and they left the brothel together to prostitute elsewhere in Nevada, and then in the friend's Oklahoma hometown.

260.   Jane Doe was subjected to debt bondage while being prostituted at the Chicken Ranch, until 2018.

261.   Jane Doe was subjected to Ms. Flowers' control, continuing to engage in prostitution and give Ms. Flowers her earnings, until 2018 in Nevada and 2019 in California.

262.   To this day, Jane Doe still suffers from the trauma and other effects of being sex trafficked, including post-traumatic stress disorder, and depression, low self-esteem, possessing a criminal record, chronic homelessness, difficulty finding employment, and loss of custody for her children.

263.   As persons recently sex trafficked within Nevada, Plaintiffs are appropriate persons to assert third-party standing on behalf of people currently being sex trafficked within legal brothels in Nevada jurisdictions which permit prostitution, and within legal escort agencies in Nevada jurisdictions that do not permit prostitution.

264.   Persons currently being sex trafficked within Nevada, being in a condition of slavery or involuntary servitude, are thereby unable to enforce their rights and seek redress apart from the third party standing which Plaintiffs assert.

**COUNT I**
**VIOLATING THE THIRTEENTH AMENDMENT BAN ON SLAVERY**

265.   Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs as if fully incorporated herein.

266.   Plaintiffs assert third party standing on behalf of people currently being sex

trafficked within legal brothels in Nevada jurisdictions which permit prostitution, and within legal escort agencies in Nevada jurisdictions that do not permit legal prostitution, as to the rights violations described below.

267. The Thirteenth Amendment to the United States Constitution guarantees Plaintiffs the freedom from enslavement and involuntary servitude, which prohibits Defendants both from directly subjecting Plaintiffs to slavery or involuntary servitude, and from providing legal cover to, or otherwise enabling, any system of slavery or involuntary servitude.

268. Sex Industry Defendants directly subjected Plaintiffs to slavery and involuntary servitude in the form of sex trafficking.

269. State and City Defendants provided legal cover for the Nevada sex trade, enabling the system through which the Plaintiffs were subjected to slavery and involuntary servitude in the form of sex trafficking.

270. Defendants' conduct has caused Plaintiffs serious harm, including physical, psychological, financial, and reputational harm.

271. Under 42 U.S.C. § 1983, Plaintiffs are entitled to a declaration that State and City Defendants violated their Thirteenth Amendment rights to be free from slavery and involuntary servitude, and an injunction against State and City Defendants' laws, policies, and actions.

272. Additionally, Plaintiffs are entitled to nominal damages from the State Defendants, and damages in an amount to be determined by the evidence and this Court from the City and Sex Industry Defendants.

## COUNT II
## VIOLATING 18 U.S.C. §§ 1591(A)(1) AND 1595 BY PERPETRATING SEX TRAFFICKING

273.     Plaintiffs reallege and incorporate by reference all prior paragraphs as if fully incorporated here.

274.     Plaintiffs assert third party standing on behalf of people currently being sex trafficked within legal brothels in Nevada jurisdictions which permit prostitution, and within legal escort agencies in Nevada jurisdictions that do not permit prostitution, as to the rights violations described below.

275.     State and City Defendants knowingly harbored and/or maintained Plaintiffs, knowing or in reckless disregard of the fact that force, fraud, and/or coercion were being used to induce Plaintiffs to engage in commercial sex acts.

276.     Sex Industry Defendants knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiffs, knowing or in reckless disregard of the fact that force, fraud, and/or coercion were being used to induce Plaintiffs to engage in commercial sex acts.

277.     Defendants knew that their conduct was in or affected interstate and/or foreign commerce.

278.     Defendants' conduct has caused Plaintiffs serious harm, including physical, psychological, financial, and reputational harm.

279.     Accordingly, Defendants violated 18 U.S.C. § 1591(a)(1), and Plaintiffs are entitled to sue them under § 1595(a).

**COUNT III**
**VIOLATING 18 U.S.C. §§ 1591(A)(2) AND 1595 BY BENEFITING FROM SEX TRAFFICKING**

280.   Plaintiffs reallege and incorporate by reference all prior paragraphs as if fully incorporated here.

281.   Plaintiffs assert third party standing on behalf of people currently being sex trafficked within legal brothels in Nevada jurisdictions which permit prostitution, and within legal escort agencies in Nevada jurisdictions that do not permit prostitution, as to the rights violations described below.

282.   Through the state entertainment tax and the general tourism revenue derived from Nevada's reputation as a legal haven for commercial sex, State Defendants knowingly benefit financially and by receiving something of value, knowing or in reckless disregard of the fact that they are participating in sex trafficking ventures.

283.   Through the state entertainment tax and the general tourism revenue derived from Nevada's reputation as a commercial sex haven, State Defendants knowingly benefit financially and by receiving something of value, from what they know or should know are sex trafficking ventures.

284.   Through local taxes, licensing fees, and the general tourism revenue derived from their reputations as legal havens for commercial sex, City Defendants knowingly benefit, financially and by receiving something of value, knowing or in reckless disregard of the fact that they are participating in sex trafficking ventures.

285.   Through local taxes, licensing fees, and the general tourism revenue derived from their reputations as legal havens for commercial sex, City Defendants knowingly benefit, financially and by receiving something of value, from what they know or should know are sex

trafficking ventures.

286.    Through revenues for commercial sex, Sex Industry Defendants knowingly benefit, financially and by receiving something of value, knowing or in reckless disregard of the fact that they are participating in sex trafficking ventures.

287.    Through revenues for commercial sex, Sex Industry Defendants knowingly benefit, financially and by receiving something of value, from what they know or should know are sex trafficking ventures.

288.    Defendants knew that their conduct was in or affected interstate and/or foreign commerce.

289.    Defendants' conduct has caused Plaintiffs serious harm, including physical, psychological, financial, and reputational harm.

290.    Accordingly, Defendants have violated 18 U.S.C. §§ 1591(a)(2) and 1595(a) and Plaintiffs are entitled to sue them under § 1595(a).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants and provide Plaintiffs and people currently being sex trafficked within legal brothels in Nevada jurisdictions which permit prostitution, and within legal escort agencies in Nevada jurisdictions that do not permit prostitution, with the following relief:

A.  A declaratory judgment as currently implemented and enforced by state and local practices and policies, the following statutes are unconstitutional:  Nev. Rev. Stat. § 244.345 (as to permitting prostitution in certain counties, escorting, and entertainment by referral service); Nev. Rev. Stat. § 244.335(2) (as to permitting prostitution in certain counties, escorting, and entertainment by referral service); § Nev. Admin. Code

§ 441A.800; and the brothel licensing ordinances of Elko, Lander, Lyon, Mineral, Nye, Storey, and White Pine Counties, to the extent that they permit prostitution: Elko, Nev., County Code, "Sexually Oriented Businesses and Employee Licensing Chapter," §6-11 (2020); Lander, Nev., County Code, "Prostitution," §5.16 (2020); Lyon, Nev., County Code, "Lyon County Brothel Ordinance," §5.03 (2020); Mineral, Nev., County Code, "Prostitution," §5.12 (2019); Nye, Nev., County Code, "Prostitution," §9.20 (2020); Storey, Nev., County Code, "Brothels," §5.16 (2015); and White Pine, Nev., County Code, "Prostitution," §10.36 (2021).

B. An injunction preventing all Defendants from implementing or enforcing:  Nev. Rev. Stat. § 244.345 (as to permitting prostitution in certain counties, escorting, and entertainment by referral service); Nev. Rev. Stat. § 244.335(2) (as to permitting prostitution in certain counties, escorting, and entertainment by referral service); § Nev. Admin. Code § 441A.800; and the brothel licensing ordinances of Elko, Lander, Lyon, Mineral, Nye, Storey, and White Pine counties, to the extent that they permit prostitution; and from any form of perpetrating or financially benefiting from violations of federal anti-trafficking laws.

C. Nominal damages against the State Defendants;

D. Compensatory, consequential, general, and punitive damages against the City and Sex Industry Defendants in an amount to be determined at trial;

E. Restitution and disgorgement of all profits and unjust enrichment obtained as a result of Defendants' unlawful conduct;

F. Plaintiffs' reasonable attorneys' fees, costs, and other costs and disbursements in this action under 42 U.S.C. § 1988; and

1        G.  All other further relief to which Plaintiffs may be entitled.

2    DATED this 10th day of September, 2021.

3
                                          */s/  Jason D. Guinasso*
4                                         Jason D. Guinasso (SBN# 8478)
                                          HUTCHISON & STEFFEN, PLLC
5                                         500 Damonte Ranch Parkway, Suite 980
                                          Reno, NV 89521
6                                         775.853.8746
                                          *jguinasso@hutchlegal.com*
7
                                          Benjamin W. Bull*
8                                         Peter A. Gentala*
                                          Dani Bianculli Pinter*
9                                         Christen M. Price*
                                          Pansy Watson*
10                                        NATIONAL CENTER ON SEXUAL
                                          EXPLOITATION
11                                        1201 F Street, NW, Suite 200
                                          Washington, DC 20004
12                                        202.393.7245
                                          *lawcenter@ncose.com*
13
                                          *Pro Hac Vice Admissions Pending*
14                                        *Attorneys for Plaintiffs*

15

16

17

18

19

20

21

22

23

24