**NATIONAL CENTER ON**
**SEXUAL EXPLOITATION**
Benjamin W. Bull*
Peter A. Gentala*
Dani Bianculli Pinter*
Christen M. Price*
Victoria L. Hirsch*
Khari A. James *
1201 F Street NW, Suite 200
Washington, DC 20004
(202) 393-7245
lawcenter@ncose.com
*Admitted pro hac vice
Attorneys for Plaintiff

**GUINASSO LAW, LTD.**
Jason D. Guinasso, Esq.
5371 Kietzke Lane
Reno, NV 89511
Tel: (775) 853-8746
Fax: (775) 201-9611
guinassolaw@gmail.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| ANGELA WILLIAMS; JANE DOE #1; & JANE DOE #2,<br><br>Plaintiffs,<br><br>v.<br><br>STEVE SISOLAK, Governor of Nevada, in his official capacity; AARON FORD, Attorney General in Nevada, in his official capacity; THE CITY OF LAS VEGAS; CLARK COUNTY; NYE COUNTY; WESTERN BEST, INC. D/B/A CHICKEN RANCH; WESTERN BEST LLC; JAMAL RASHID; MALLY MALL MUSIC, LLC; FUTURE MUSIC, LLC; PF SOCIAL MEDIA MANAGEMENT, LLC; E.P. SANCTUARY; BLUE MAGIC MUSIC, LLC; EXCLUSIVE BEAUTY LOUNGE, LLC; FIRST INVESTMENT PROPERTY, LLC; V.I.P. ENTERTAINMENT, LLC; MP3 PRODUCTIONS, INC.; SHAC, LLC D/B/A SAPPHIRE GENTLEMEN'S CLUB AND/OR SAPPHIRE; SHAC MT, LLC; and LAS VEGAS BISTRO, LLC D/B/A LARRY FLYNT'S HUSTLER CLUB,<br><br>Defendants. | Case No.: 2:21-cv-01676-APG-MDC<br><br><br>**PLAINTIFF JANE DOE #2'S MOTION FOR RECONSIDERATION OR, IN THE ALTERNATIVE, CLARIFICATION OF ORDER [ECF No. 322] GRANTING DEFENDANT LAS VEGAS BISTRO, LLC'S MOTION TO COMPEL ARBITRATION [ECF No. 251]** |

1

## I.    INTRODUCTION

Plaintiff Jane Doe #2 ("Plaintiff" or "Jane Doe #2") respectfully moves this Court to reconsider its August 26, 2025, order granting Defendant Las Vegas Bistro's Motion to Compel Arbitration. This motion is brought pursuant to Federal Rule of Civil Procedure 54(b), which permits reconsideration of interlocutory orders "at any time before the entry of a judgment." [ECF No. 322]

The Court's order appears to have applied the "disavowal doctrine" to compel arbitration. However, it is unclear whether the Court compelled arbitration because it believed that Plaintiff failed to disavow the contract as a whole, the arbitration provision it contained, or both. Regardless, this doctrine is fundamentally inapplicable where, as here, the plaintiff challenges the very existence of any valid contract and arbitration agreement due to: (1) her status as a sex trafficking victim who lacked capacity to consent; (2) federal law's prohibition against recognizing contracts involving victims of sex abuse; and (3) the procurement of any purported agreement through duress and coercion. These are threshold questions of contract formation that must be decided by the Court, not delegated to an arbitrator.

## II.    LEGAL STANDARD

Under Rule 54(b), "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties... may be revised at any time before the entry of a judgment." Fed. R. Civ. P. 54(b). The Ninth Circuit recognizes that reconsideration is appropriate when: (1) the court is presented with newly discovered evidence; (2) the court committed clear error or the initial decision was manifestly unjust; or (3) there is an intervening change in controlling law. *Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1124 (9th Cir. 2005).

2

A motion for clarification is appropriate when an order's basis or scope is ambiguous. *United States v. Comprehensive Drug Testing, Inc.*, 513 F.3d 1085, 1101 (9th Cir. 2008). Such motions are reasonable under F.R.C.P. 60(a) when seeking to determine the effect of a court's ruling. *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1105-06 (9th Cir. 1999).

## III.    ARGUMENT

### A. The Court Committed Clear Error by Applying the Disavowal Doctrine to Questions of Contract Formation

In her Opposition to Defendant Las Vegas Bistro, LLC's Motion to Compel Arbitration, Doc. 266, Jane Doe #2 argued that no valid contract or arbitration agreement were formed. Doc. 266 at 4, 6, 11. The Supreme Court has made abundantly clear that "where the dispute at issue concerns contract formation, the dispute is generally for courts to decide." *Granite Rock Co. v. International Brotherhood of Teamsters*, 561 U.S. 287, 296 (2010). In *Granite Rock*, the Court instructed that judges "should order arbitration of a dispute only where [the court] is satisfied that neither the formation of the parties' arbitration agreement nor... its enforceability or applicability to the dispute is in issue." *Id.* at 297. "Where a party contests either or both matters, 'the court' must resolve the disagreement." *Id.* As the Supreme Court has reiterated, "arbitration is strictly a matter of consent", *id.* at 299, meaning that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Casa del Caffe Vergnano S.P.A. v. ItalFlavors, LLC*, 816 F.3d 1208, 1211 (9th Cir. 2016).

The Ninth Circuit applied this principle in *Casa del Caffe Vergnano*, which involved a commercial franchise contract that contained an arbitration clause. In its reasoning, the Court explained, "While the Commercial Contract at issue here contained a clause committing the

parties to arbitrate, the threshold issue is whether that document constituted a binding agreement at all. If it did not constitute such an agreement, if follows that the arbitration agreement is not enforceable." *Casa del Caffe Vergnano S.P.A. v. ItalFlavors, LLC*, 816 F.3d 1208, 1211 (9th Cir. 2016) (finding that because the contract was a sham, the arbitration clause it contained was unenforceable).

When a party disputes "the making of the arbitration agreement," as Jane Doe #2 clearly did, the Federal Arbitration Act itself states the court must "proceed summarily to the trial thereof" before compelling arbitration. 9 U.S.C. § 4. The Ninth Circuit has "interpreted this language to encompass not only challenges to the arbitration clause itself, but also challenges to the making of the contract containing the arbitration clause." *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140 (9th Cir. 1991).

**1. No Agreement was Formed because Jane Doe #2 Lacked the Mental Capacity to Assent**

As the Supreme Court has repeatedly emphasized, "[t]he issue of the contract's validity is different from the issue of whether any agreement between the alleged obligor and obligee was ever concluded." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n.1 (2006). The Court specifically noted that challenges based on whether "the signor lacked the mental capacity to assent" concerns whether an agreement was ever formed between the parties, not the contract's validity. *Id*.

This Court comprehensively addressed this precise issue in *Mayorga v. Ronaldo*, 491 F.Supp.3d 840 (D. Nev. 2020), where it conducted an exhaustive analysis of when mental capacity challenges must be decided by courts rather than arbitrators. The Court explained:

> I am persuaded that [plaintiff's] challenge that she lacked the mental capacity to assent to the settlement agreement goes to whether any agreement (settlement

and arbitration) was ever formed between the parties and is therefore a question for the court to resolve.

*Id.* at 853.

The *Mayorga* Court adopted the Tenth Circuit's reasoning in *Spahr v. Secco*, 330 F.3d 1266 (10th Cir. 2003), reasoning:

> Unlike a claim of fraud in the inducement, which can be directed at individual provisions in a contract, a mental capacity challenge can logically be directed only at the entire contract... [The distinction is between] challeng[ing] a contract on the basis of the conduct of the bargaining parties [versus] on the basis of [a bargaining party's] status.

*Mayorga*, 491 F.Supp.3d at 854.

The *Mayorga* Court concluded that mental incapacity challenges "must be determined by the court because [they] naturally go[] to both the entire [agreement] and the specific agreement to arbitrate within it." *Id.* at 854.

Jane Doe #2's case presents even more compelling circumstances than *Mayorga* that should have persuaded the court to determine the validity of her challenges. While the *Mayorga* plaintiff challenged her capacity based on trauma from a single past assault, Jane Doe #2 has already brought forth the following harrowing facts to this Court in her Opposition and Declaration:

- She was an 18-year-old high school student actively being sex trafficked; Doc. 266; Decl. of JD #2 at ¶ 17.
- Under ongoing control and coercion by multiple traffickers; *Id.* at ¶ 3-5, 16;
- Under the influence of controlled substances when forced to sign; *Id.* at ¶ 15;
- Threatened with death if she did not comply; *Id.* at ¶ 12-14;
- Rushed through signing in an isolated basement without any opportunity to review the agreement; *Id.* at ¶ 19-20;
- Given no explanation of what she was signing; *Id.* at ¶ 19-20;
- Unaware that the documents contained arbitration provisions; *Id.* at ¶ 18; and
- Unaware of what arbitration even was. Doc. 266; Decl. of JD #2 at ¶ 19.

5

These facts do not just establish a question of mental capacity, but call into question the existence of the formation of any voluntary agreement whatsoever.

**2. The Disavowal Doctrine Applies in Narrow Circumstances, which are Non-Existent Here**

The disavowal doctrine is an equitable estoppel principle that prevents a party from enforcing favorable provisions of a contract while simultaneously repudiating its unfavorable terms, such as an arbitration clause. *Cavanaugh v. Fanatics, LLC*, 738 F. Supp. 3d 1285, 1299 (E.D. Cal. 2024). Victims of duress are required to disavow a contract once duress ceases, which can be shown through timely legal action. *Barnette v. Wells Fargo Nevada Nat. Bank of San Francisco*, 270 U.S. 438, 444 (1926). A timely legal action, clearly, includes bringing an action within the applicable statute of limitations, which Jane Doe #2 has done here. Even if a contract existed, which Jane Doe #2 disputes, she has clearly disavowed it. **Nonetheless, the doctrine of disavowal fundamentally presumes the existence of an <u>enforceable</u> contract that the plaintiff seeks to enforce.**

In *Cavanaugh*, the court found the doctrine applicable because the plaintiff explicitly sued for breach of contract—acknowledging a valid contract existed—while attempting to avoid its arbitration provision. *Id.* The plaintiff sought damages for Fanatics' alleged breach of its shipping promises, thereby invoking the contract's benefits. *Id.* at 1290. Similarly, courts apply the disavowal doctrine when plaintiffs "sue[] on the contract" or seek "to enforce other provisions of a contract while avoiding arbitration." *Id.* at 1299.

**Here, Jane Doe #2 does not seek to enforce any provision of the purported agreement because there was not any enforceable agreement.** She does not sue for breach of contract, seek damages under the agreement, or claim any benefits from it. Instead, she brings

claims under federal anti-trafficking statutes (18 U.S.C. § 1595) and state tort law that exist independently of any contract. Her claims arise from Las Vegas Bistro's participation in sex trafficking—criminal conduct that cannot be legitimized through contract.

It does not follow for the disavowal doctrine to apply where the plaintiff challenges whether any enforceable agreement was ever formed. As established above, questions of contract formation—including duress, and void agreements—are threshold issues for the court. The doctrine presupposes that a valid contract exists; it cannot bootstrap an invalid or non-existent agreement into enforceability.

Critically, **Las Vegas Bistro's own briefing acknowledges this distinction.** In their motion, they argue that ratification and disavowal principles apply when a contract "may have been voidable at the time of its creation." (ECF 251 at 15). But Jane Doe #2 does not just argue the agreement was merely voidable—she contends it is **void ab initio,** Doc. 266 at 21**,** because:

1. **The existence of duress negates formation:** A sex trafficking victim under duress cannot form a contract with her traffickers. Unlike typical commercial disputes where no duress is presumed, trafficking inherently destroys the victim's autonomy and ability to give reasoned, informed consent. Death threats and trafficking coercion do not create voidable contracts subject to ratification—they prevent contract formation entirely. Nevada law recognizes that duress involving threats of death or serious harm renders agreements void, not merely voidable. *Sheriff v. Marcum*, 105 Nev. 824, 828 (1989).
2. **The agreement violates federal law:** Agreements arising from or facilitating sex trafficking are void as against public policy. *Carton v. B & B Equities Grp., LLC*, 827 F. Supp. 2d 1235, 1244 (D. Nev. 2011) (contracts violating public policy are "void ab initio and will be treated as though no contract ever existed").

Las Vegas Bistro's attempt to invoke ratification principles further demonstrates the inapplicability of the disavowal doctrine. They argue Jane Doe #2 "ratified" the agreement by performing at the club. (ECF 251 at 15). But **a void contract cannot be ratified.** As *Carton* explains, void contracts are "treated as though no contract ever existed"—

7

there is nothing to ratify. 827 F. Supp. 2d at 1244. Moreover, continued performance under trafficking coercion cannot constitute ratification; it merely evidences ongoing victimization.

The Court should reconsider its incorrect application of the disavowal doctrine to both the contract itself and the arbitration provision, as applying this doctrine bypasses essential issues regarding contract formation, capacity, and illegality that must be addressed prior to establishing the existence of an agreement to be "disavowed."

**B. The Court Must Consider Federal Law's Prohibition Against Contracts Involving Sex Trafficking Victims**

**1. Agreements between perpetrators and victims as part of ongoing violations of the Trafficking Victims Protection Reauthorization Act (TVPRA) are void**

As Plaintiff explained in her Opposition, Doc. 266 at 21, agreements that would force a trafficking victim to arbitrate her trafficking claims against her direct trafficker are void for violating public policy. The TVPRA, 18 U.S.C. § 1591, criminalizes sex trafficking and 18 U.S.C. § 1595 creates civil remedies for victims. The statute defines sex trafficking as obtaining a person for commercial sex acts through "force, fraud, or coercion." § 1591(a). Critically, "coercion" includes:

> (A) threats of serious harm to or physical restraint against any person; (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or (C) the abuse or threatened abuse of law or the legal process.

§ 1591(e)(2).

Federal courts have consistently held that **contracts cannot legitimize or arise from criminal conduct.** *Taie v. Ten Bridges, LLC*, 704 F.Supp.3d 1147 (W.D. Wash. 2023) ("Where the contract grows immediately out of, and is connected with, an illegal act, a Court of justice

will not lend its aid to enforce it.”); *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77 (1982) (“illegal promises will not be enforced in cases controlled by federal law”); *McMullen v. Hoffman*, 174 U.S. 639, 654 (1899) (contracts “founded upon an illegal consideration” are void and unenforceable). This principle applies with particular force to human trafficking, which Congress has recognized as “a contemporary manifestation of slavery.” 22 U.S.C. § 7101(b)(1).

In this District, contracts that violate fundamental public policy are “void ab initio and will be treated as though no contract ever existed.” *Carton v. B & B Equities Grp., LLC*, 827 F. Supp. 2d 1235, 1244 (D. Nev. 2011). As Judge Gordon recognized in *Mayorga*, courts must be particularly vigilant when contracts implicate fundamental rights and human dignity. 491 F. Supp. 3d at 855-56.

**An arbitration agreement between a trafficker and victim is not merely voidable—it is void as the product of ongoing criminal enterprise.** Several factors compel this conclusion:

**First**, the agreement itself constitutes “abuse of the legal process” under § 1591(e)(2)(C). By forcing a trafficking victim to sign legal documents that restrict her ability to seek justice, traffickers weaponize the legal system as an instrument of coercion. The arbitration clause here operates as a tool of trafficking by:

- Concealing criminal conduct from public and law enforcement scrutiny
- Isolating victims from the judicial system’s protective mechanisms
- Creating procedural barriers that discourage victims from seeking help
- Perpetuating the trafficker's control through legal intimidation

**Second**, enforcing such agreements to arbitrate a trafficking case would make courts complicit in trafficking. The Supreme Court has long held that courts “will not lend their aid to the enforcement of an illegal contract.” *Kaiser Steel*, 455 U.S. at 77. “Even if the contract is only

partially connected with the illegal consideration…it is equally tainted by it." *Armstrong v. Toler*, 24 U.S. 258 (1826). To compel a trafficking victim to arbitrate with her trafficker would transform the federal judiciary from protector to facilitator of human trafficking.

**Third**, the agreement cannot be severed from the trafficking relationship. Unlike commercial contracts where illegality might taint one provision, here the entire "contractual" relationship exists solely to facilitate trafficking. Jane Doe #2 was forced to sign these documents specifically to work at a venue where she would be trafficked—not only by third party traffickers, but directly by the Defendant itself. The agreement's very purpose was criminal.

### a.  Federal Anti-Trafficking Policy Prohibits Enforcement

Congress has enacted comprehensive legislation recognizing that trafficking victims require special protection from legal manipulation. The Trafficking Victims Protection Act declares that trafficking victims "should not be inappropriately incarcerated, fined, or otherwise penalized solely for unlawful acts committed as a direct result of being trafficked." 22 U.S.C. § 7101(b)(19). This principle extends to civil contexts—victims cannot be bound by agreements they were forced to sign while being trafficked.

The Department of Justice's position is clear: "Victims of severe forms of trafficking should not be held responsible for crimes or immigration violations they commit as a direct result of their trafficking situation." *DOJ Human Trafficking Prosecution Manual* (2017). If immunity extends to criminal acts committed under trafficking coercion, civil agreements signed under the same coercion cannot be enforceable.

### b.  Congressional Recognition Through the EFAA Confirms the Principle

While the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 (EFAA) applies prospectively to claims arising after March 3, 2022, it codifies

Congress's recognition that forced arbitration is fundamentally incompatible with addressing sexual violence. The House Judiciary Committee Report stated:

> "Forced arbitration clauses undermine the development of public law because there is no judicial review of arbitrators' decisions. Arbitrators' decisions are generally not public, depriving the public of knowledge of both the conduct that gave rise to the claims and the outcome of the dispute...This secrecy deprives other victims of the knowledge that they were harmed and prevents them from pursuing relief."

H.R. Rep. No. 117-270 (2022). If Congress determined that sexual harassment—workplace misconduct—warrants exemption from forced arbitration, then sex trafficking—modern slavery involving rape, violence, and complete deprivation of liberty—must *a fortiori* be exempt from arbitration. Sex trafficking is repeated, commercialized, sexual assault.

The EFAA also confirms that courts, not arbitrators, must determine the validity of arbitration agreements in cases involving sexual violence, "irrespective of whether the party resisting arbitration challenges the arbitration agreement specifically or in conjunction with other terms of the contract." 9 U.S.C. § 402(b). While not retroactive, this provision reflects Congress's understanding that sexual violence cases require special procedural protections.

### c. No Court Has Compelled Arbitration of Trafficking Claims Against Traffickers

While Las Vegas Bistro cites cases where courts have compelled arbitration of TVPRA claims in other contexts (ECF 271 at 8), **none involved a victim forced to arbitrate with her actual trafficker.** The cited cases involve:

- Employment disputes with third parties (*K.T. v. A Place for Rover*, No. CV 23-02858, 2023 WL 7167580 (E.D. Pa. Oct. 31, 2023))
- International labor trafficking (*Calicdan v. MD Nigeria LLC*, No. 6:21-CV-03283, 2022 WL 2165638 (W.D. La. May 17, 2022))
- Claims against separate entities (*Baricuatro v. Indus. Pers.*, No. CV 11-2 777, 2014 WL 3094750 (E.D. La. July 7, 2014))

11

These cases are fundamentally different. Compelling arbitration between a trafficking victim and her trafficker would be unprecedented and unconscionable. It would force Jane Doe #2 to present her trafficking claims in a private forum to a single arbitrator, without public scrutiny, appellate review, or the protections afforded by federal court.

**The Court should not be the first to force a sex trafficking victim into secret arbitration with her trafficker.** Such a ruling would contravene federal anti-trafficking policy, undermine the TVPRA's remedial purpose, and send a devastating message to trafficking victims that the legal system will enforce their traffickers' paperwork against them—even before conducting a hearing on whether the agreement was validly entered into. Jane Doe #2 has alleged substantially the same claims against Las Vegas Bistro as against the SHAC Defendants, and the court found that she stated a claim against SHAC for direct trafficking.

### C. The Agreement Was Procured Through Duress, Rendering It Void

Under Nevada law, duress occurs when "there has been an 'improper threat' that leaves the victim of the duress with 'no reasonable alternative' than to assent." *Healey v. Adamson*, 2021 WL 3509717, at *2 (D. Nev. 2021). Courts look at whether the victim "was threatened by anyone" or "forced by anyone to enter into an agreement." *Robinson v. Universal Health Services, Inc.*, 2022 WL 17418562, at *1 (D. Nev. 2022). In general, a contract induced through duress is voidable. *B & C Enterprises v. Utter*, 88 Nev. 433, 435 (1972).

However, **when duress involves threats of death or serious bodily harm, the agreement is void, not merely voidable.** The Restatement (Second) of Contracts § 174 distinguishes between economic duress (voidable) and physical compulsion or threats of imminent physical harm (void). Nevada courts recognize this distinction. *Sheriff v. Marcum*, 105 Nev. 824, 828 (1989) (threats of physical violence negate consent entirely).

**1. Jane Doe #2's Declaration Establishes Duress as a Matter of Law**

The undisputed facts from Jane Doe #2's Declaration demonstrate duress far exceeding the threshold for voiding any agreement:

**Death Threat (¶ 13):** Her trafficker explicitly threatened to kill her if she did not get hired at Hustler/Las Vegas Bistro. This was not hyperbole or an idle threat—sex traffickers routinely use violence to control victims. The TVPRA recognizes that traffickers maintain control through "threats of serious harm to or physical restraint." 18 U.S.C. § 1591(e)(2)(A).

**Intoxication (¶ 15):** Jane Doe #2 was high on substances when forced to sign. Nevada law recognizes that intoxication combined with undue influence voids consent. *Poole v. Poole*, 81 Nev. 357, 361 (1965).

**Isolated and Coerced (¶ 16, 20):** Multiple Las Vegas Bistro employees surrounded Jane Doe #2 in an isolated basement, gave her no opportunity to review the documents, and pressured her to sign immediately. No one was present to act on her behalf. This satisfies the "no reasonable alternative" prong—she was physically isolated with no escape.

**Age and Vulnerability (¶ 17):** At 18 years old, still in high school, she was particularly vulnerable to coercion. Nevada recognizes that youth combined with other factors enhances duress. *Kaldi v. Farmers Ins. Exchange*, 117 Nev. 273, 281 (2001).

**No Understanding (¶¶ 18-19):** She did not know the documents contained arbitration provisions and had no understanding of what arbitration meant. Lack of knowledge combined with coercion negates any possible consent. *Gen. Motors v. Jackson,* 111 Nev. 1026, 1031, 900 P.2d 345, 348–49.

**No Copy Provided (¶ 21):** Las Vegas Bistro never provided her a copy of what she signed, preventing any opportunity for reflection or consultation.

### 2.  Las Vegas Bistro Cannot Claim Good Faith

Las Vegas Bistro cannot escape liability by claiming ignorance of the duress. Nevada law recognizes that duress by third parties voids contracts when the benefiting party knows or should know of the coercion. *Cross v. Cross*, 95 Nev. 251, 254 (1979). Here:

- Las Vegas Bistro knew Jane Doe #2 arrived with a "manager" (trafficker);
- The club specifically catered to and profited from trafficked women;
- Multiple employees participated in the coercive signing process; and
- The isolated basement signing location suggests deliberate exploitation.

Even if Las Vegas Bistro claims ignorance of the death threat, their employees' participation in the coercive signing process constitutes independent duress sufficient to void the agreement.

### 3.  The Agreement Cannot Be Ratified

Las Vegas Bistro argues Jane Doe #2 "ratified" the agreement by performing at the club. (ECF 251 at 15). This argument fails for multiple reasons:

**First**, void agreements cannot be ratified. *Armijo v. Nuchols*, 57 N.M. 30, 35 (1953) (ratification applies only to voidable, not void, contracts). Death threats render agreements void, not voidable.

**Second**, continued performance under ongoing duress does not constitute ratification. Jane Doe #2 remained under trafficker control throughout her time at the club, by both the club itself and her external traffickers. "Ratification requires voluntary action after the duress has been removed." *77 A.L.R.2d 426, § 6*. The duress never ceased—it intensified.

**Third**, Nevada law requires "full knowledge of facts" for ratification. *Tofani v. Anter*, 2017 WL 6541827, at *7 (Nev. 2017). Jane Doe #2 never knew the agreement contained arbitration provisions, so she could not knowingly ratify them.

The extreme duress here—death threats, intoxication, isolation, and ongoing trafficking—voids any purported agreement as a matter of law.

### D. In the Alternative, the Court Should Clarify Its Order

Courts in the Ninth Circuit routinely grant motions for clarification to ensure clarity in their rulings and to address ambiguities that affect the parties' rights and obligations. *Knapp v. Miller*, 873 F. Supp. 375, 378 (D. Alaska 1994) (granting motion for clarification to ensure clarity regarding unresolved claims); *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1100 (9th Cir. 1999) (finding motion for clarification "reasonable and appropriate" to clarify res judicata effects).

Motions for clarification may be brought under Fed. R. Civ. P. 59(e) to "address clear errors, prevent manifest injustice, or account for changes in controlling law." *Swan View Coalition v. Weber*, 52 F. Supp. 3d 1160, 1165 (D. Mont. 2014). Additionally, Rule 60(a) permits clarification to correct ambiguities that obscure the court's intent. *Big Bear Lodging*, 182 F.3d at 1100.

Given the sparse minute order stating only "The Motion to Compel Arbitration is GRANTED," Plaintiff respectfully requests clarification regarding:

1. **The legal basis for the ruling:** What legal doctrine or principle formed the basis for granting the motion despite Plaintiff's challenges to contract formation based on sex trafficking, lack of capacity, and duress?
2. **The scope of arbitration:** Does the order compel arbitration of all claims, including federal sex trafficking claims under 18 U.S.C. § 1595, which may implicate non-waivable federal rights?
3. **The effect on gateway issues:** Did the Court determine that the arbitrator, rather than the Court, should decide threshold questions of contract formation, capacity, and duress?
4. **The procedural status:** Is the entire action stayed pending arbitration pursuant to 9 U.S.C. § 3, or are certain claims or parties dismissed?
5. **The applicability to all defendants:** Does the order apply only to Las Vegas Bistro or to other defendants who did not move to compel arbitration?

15

6. **Disavowment:** Can the Court provide clarification as to which facts gave rise to the Court applying the Disavowal Doctrine given that the Plaintiff argues that there was no enforceable contract or arbitration agreement?

This clarification is essential for determining numerous important issues, including whether the order constitutes a "final decision" appealable under 9 U.S.C. § 16(a)(3) or an interlocutory order under § 16(b); which issues must be presented to an arbitrator versus those that remain before the Court; and proper preservation of all arguments for potential appellate review. In addition, counsel must be able to fully advise Plaintiff of her rights and obligations going forward.

## IV.    REQUEST FOR EVIDENTIARY HEARING

As the Court briefly discussed during the oral argument on the Motion to Compel Arbitration, Plaintiff respectfully requests an evidentiary hearing to resolve the genuine disputes of material fact that preclude summary determination of the arbitration issue. The Ninth Circuit mandates evidentiary hearings when material facts regarding arbitration agreements are disputed. *Sanford v. MemberWorks, Inc.*, 483 F.3d 956, 963 (9th Cir. 2007) ("If the district court concludes that genuine disputes of material fact exist as to the making of the agreement to arbitrate, the court must hold an evidentiary hearing and make findings on the disputed issues of fact before ruling on the motion to compel arbitration.").

The Federal Arbitration Act itself requires that when "the making of the arbitration agreement... be in issue," the court must "proceed summarily to the trial thereof." 9 U.S.C. § 4. This mandatory language reflects Congress's recognition that factual disputes about arbitration agreements cannot be resolved on papers alone. There are a number of material facts in dispute that require a hearing:

### 1. Plaintiff's Mental Capacity and State of Mind

Las Vegas Bistro disputes Jane Doe #2's mental state when signing, claiming she has provided "no evidence that she was incapable of understanding the nature of the agreements' transactions." (ECF 271 at 11). This creates a direct factual dispute requiring testimony regarding:

- Her level of intoxication from substances provided by traffickers;
- Her mental state resulting from ongoing trauma and abuse;
- Her cognitive capacity as an 18-year-old high school student under extreme stress; and
- The psychological effects of trafficking control on decision-making capacity.

Jane Doe #2's testimony, supported by expert psychological evaluation, would establish her inability to form contractual intent—a determination that requires credibility assessments impossible on written submissions alone.

### 2. Circumstances of Signing and Coercion

The parties fundamentally dispute the signing circumstances. Las Vegas Bistro claims a routine business transaction; Jane Doe #2 describes coercive isolation in a basement. An evidentiary hearing would resolve:

- The physical layout and isolation of the signing location;
- The number and identity of Las Vegas Bistro employees present;
- The time pressure and lack of opportunity to review documents;
- Whether Jane Doe #2 appeared distressed, intoxicated, or under duress; and
- The presence and role of her trafficker in orchestrating the hiring.

Testimony from Jane Doe #2 and potentially other witnesses would establish the coercive atmosphere that negated any possibility of voluntary consent.

### 3. Las Vegas Bistro's Knowledge of Trafficking

Las Vegas Bistro denies knowledge that Jane Doe #2 was trafficked, claiming she provided "no evidence that Bistro knew she was under duress/coercion." (ECF 271 at 8 n.12).

This factual dispute is material because knowing participation in third-party duress voids contracts under Nevada law. Evidence would address:

- Communications between traffickers and club management;
- The club's awareness that Jane Doe #2 arrived with a "manager";
- Observable signs of trafficking control (accompanying trafficker, Jane Doe #2's demeanor, age);
- The club's general practices regarding dancers with "managers"; and
- Industry knowledge about trafficking in Las Vegas strip clubs.

### 4. Content and Explanation of Documents

A crucial dispute exists regarding what Jane Doe #2 was told about the documents and whether she received any explanation of their contents:

- Whether anyone explained the arbitration provision;
- Whether she was given time to read any portion of the agreements;
- Whether the arbitration clause was mentioned or highlighted;
- Whether she was told these were merely "employment paperwork"; and
- Why she never received copies despite the agreement requiring it.

**The Court Cannot Make Credibility Determinations Without a Hearing**

The Supreme Court has recognized that "where the motion to compel arbitration is opposed on the ground that no agreement to arbitrate was made, the court must proceed to determine that issue." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403 (1967). When opposing affidavits create factual disputes, "the party opposing arbitration should be given the benefit of all reasonable doubts and inferences that may arise." *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980).

Here, Jane Doe #2's Declaration directly contradicts any presumption of voluntary agreement. Her credibility is paramount—the Court must observe her testimony to assess whether an 18-year-old trafficking victim had the capacity and freedom to enter a binding arbitration agreement with her traffickers' business partners.

**Proposed Hearing Structure**

Plaintiff proposes a focused evidentiary hearing addressing:

1. **Jane Doe #2's Testimony** (in camera if necessary for safety): Direct examination regarding her mental state, the signing circumstances, understanding of documents, and ongoing coercion.
2. **Expert Testimony**: Psychological expert on trafficking victims' capacity to consent and the impact of coercion on decision-making.
3. **Las Vegas Bistro Witnesses**: Employees present at signing regarding their observations and standard practices.
4. **Documentary Evidence**: The physical agreements, club policies, and any communications regarding Jane Doe #2's hiring.

Given the sensitive nature of sex trafficking testimony, Plaintiff requests appropriate protective measures including potential in camera proceedings, sealed testimony, or video testimony if necessary for witness safety.

**Denial Without Hearing Would Be Reversible Error**

The Ninth Circuit has repeatedly reversed district courts that decided arbitration motions without hearings when material facts were disputed. *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 804 (N.D. Cal. 2004) ("A court may not weigh evidence and make credibility determinations at the motion to compel stage absent an evidentiary hearing."). Given the extraordinary circumstances here—sex trafficking, death threats, and fundamental challenges to contract formation—deciding without a hearing would constitute clear error.

The Court should not compel a trafficking victim to arbitrate based solely on her traffickers' paperwork without hearing her testimony about the circumstances of signing.

V.    **CONCLUSION**

The Court should reconsider its order compelling arbitration because:

1. **The disavowal doctrine cannot apply** to disputes over whether any valid contract exists.
2. **Federal law prohibits** enforcement of contracts arising from sex trafficking.

19

3. **Fundamental questions of capacity and duress** must be resolved by the Court, not an arbitrator.
4. **Clear error occurred** in applying contract enforcement principles to a void agreement.

Alternatively, the Court should clarify the basis and scope of its ruling to ensure proper appellate review and preservation of Plaintiff's rights.

For a sex trafficking victim to be forced into secret arbitration with her trafficker would not merely be unjust—it would perpetuate the very abuse that federal law seeks to prevent. The Court has both the authority and the obligation to prevent such a result.

Respectfully submitted,

Dated: September 23, 2025

/s/ Jason D. Guinasso
Jason D. Guinasso (SBN #8478)
GUINASSO LAW, LTD.

Christen M. Price*
Benjamin W. Bull*
Peter A. Gentala*
Dani Bianculli Pinter*
Victoria L. Hirsch*
Khari A. James*
NATIONAL CENTER ON
SEXUAL EXPLOITATION

*Attorneys for Plaintiff*
*Admitted pro hac vice*

## ELECTRONIC CERTIFICATE OF SERVICE

Pursuant to FRCP 5(b), I hereby certify that on this 23rd day of September, 2025, a true and correct copy of the foregoing **PLAINTIFF JANE DOE #2'S MOTION FOR RECONSIDERATION OR, IN THE ALTERNATIVE, CLARIFICATION OF ORDER [ECF No. 322] GRANTING DEFENDANT LAS VEGAS BISTRO, LLC'S MOTION TO COMPEL ARBITRATION [ECF No. 251]** was electronically filed with the United States District Court. Electronic service of the foregoing document shall be made in accordance with the Master Service List.

*/s/ Bernadette Francis*